The **NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM, Plaintiff,**

v.

**AMERICAN BRANDS, INC., Defendant.**

**No. 86 Civ. 3188 (RLC).**

United States District Court, S.D. New York.

May 12, 1986.

Frederick A.O. Schwarz, Jr., New York City, Corporation Counsel for the City of N.Y., for plaintiff: by James F. Simon, Asst. Corp. Counsel.

Chadbourne & Parke, New York City, for defendant: by Edward C. McLean, Jr., Donald I. Strauber, Robert A. Schwinger.

## OPINION AND ORDER

ROBERT L. CARTER, District Judge.

Plaintiff The New York City Employees' Retirement System ("NYCERS") has moved by an Order to Show Cause for a preliminary injunction requiring American Brands, Inc. ("Brands") to include in management's proxy solicitation materials for the May 23, 1986 annual meeting of shareholders, plaintiff shareholder's proposed implementation of the MacBride Principles: guidelines for equal employment practices by Brands' Northern Ireland subsidiary. Plaintiff seeks to bar Brands from soliciting proxies at the annual meeting unless it makes a supplemental mailing to solicit proxies for plaintiff's proposal that the MacBride Principles be adopted by its Northern Ireland subsidiary.[1]

At the May 2, 1986 hearing on the motion, Brands appeared and argued that certain portions of the shareholder proposal violated Northern Ireland law, and hence were properly excludable under The Security Exchange Commission ("SEC") Rule 14a–8(c)(2), 17 C.F.R. § 240.14a–8(c)(2). That rule permits an issuer of securities to omit from its proxy materials any shareholder proposal which, "if implemented would require the issuer to violate ... any law of any foreign jurisdiction to which the issuer is subject...."

Furthermore, Brands argued that NYCERS would suffer no irreparable harm since the court could order a new solicitation of the shareholders on the MacBride issue at a special meeting called for that purpose and that no private right of action should be implied under § 14(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78n(a), for alleged violations of SEC Rule 14a–8 where plaintiff has not exhausted its administrative remedies.

---

1. SEC Rule 14a–8(a), 17 C.R.F. § 240.14a–8(a), regarding proposals of security holders, reads, in relevant part, as follows:

If any security holder of an issuer notifies the issuer of his intention to present a proposal for action at a forthcoming meeting of the issuer's security holders, the issuer shall set forth the proposal in its proxy statement and identify it in its form of proxy and provide means by which security holders can make the specification required by Rule 14a–4(b) [17 CFR 240.14a–4(b) ].

NYCERS is a pension system organized and existing under the laws of the State and City of New York for the benefit of city employees, which holds equity securities of defendant. On April 11, 1985, the NYCERS Board of Trustees adopted a policy of ensuring that companies in which NYCERS holds equity securities follow fair employment practices in Northern Ireland. This policy instructs Harrison J. Goldin, Comptroller of the City of New York, as custodian of NYCERS' assets, to present shareholder proposals to companies operating in Northern Ireland in which NYCERS invests, requesting that these companies conform to certain fair employment principles.[2] Defendant is a Delaware corporation whose wholly-owned subsidiary, Gallaher Limited ("Gallaher") has tobacco factories in Northern Ireland.

In November 1985, plaintiff and two other shareholders—not parties here—requested that the instant shareholder proposal be included in defendant's proxy solicitation materials for its May 23, 1986 meeting. Defendant, on the advice of its counsel in the United Kingdom that certain of the MacBride Principles would violate United Kingdom law, decided to omit NYCERS' proposal from its proxy materials, citing Rule 14a–8(c)(2), 17 C.F.R. § 240.-14a–8(c)(2). Defendant notified the SEC of its decision to exclude NYCERS' proposal from its proxy materials and provided the SEC with a copy of its counsel's opinion, as required by 17 C.F.R. § 240.14a–8(d).

Although the SEC staff informed Brands on January 30, 1986, that it did not concur in Brand's position that it was entitled to omit NYCERS' proposal from its proxy materials under Rule 14a–8(c)(2), the SEC staff later reversed itself and issued a "no action" letter indicating that it would not recommend any enforcement action to the full commission if defendant omitted NYCERS' proposal from its proxy materials.

2. The NYCERS' proposal to the American Brands shareholders reads as follows:

WHEREAS, American Brand's subsidiary in Northern Ireland, Gallaher Ltd. of Belfast and Ballymena is one of the largest foreign-owned firms in that country;

WHEREAS, discrimination against Northern Ireland's Catholic minority in employment has been cited by the International Commission of Jurists as being one of the major causes of the conflict in that country;

WHEREAS, census figures for Northern Ireland show that the unemployment rate for Catholic male workers in the Belfast urban area is almost two and a half times that of Protestant workers;

WHEREAS, Dr. Sean MacBride, founder of Amnesty International and Nobel Peace laureate, has recently proposed several equal opportunity employment principles to serve as guidelines for corporations in Northern Ireland. These include:

1. Increasing the representation of individuals from underrepresented religious groups in the workforce including managerial, supervisory, administrative, clerical and technical jobs.

2. Adequate security for the protection of minority employees both at the workplace and while traveling to and from work.

3. The banning of provocative religious or political emblems from the workplace.

4. All job openings should be publicly advertised and special recruitment efforts should be made to attract applicants from underrepresented religious groups.

5. Layoff, recall, and termination procedures should not, in practice, favor particular religious groupings.

6. The abolition of job reservations, apprenticeship restrictions, and differential employment criteria, which discriminate on the basis of religion or ethnic origin.

7. The development of training programs that will prepare substantial numbers of current minority employees for skilled jobs, including the expansion of existing programs and the creation of new programs to train, upgrade, and improve the skills of minority employees.

8. The establishment of procedures to assess, identify, and actively recruit minority employees with potential for further advancement.

9. The appointment of a senior management staff member to oversee the company's affirmative action efforts and the setting up of timetables to carry out affirmative action principles.

RESOLVED, Shareholders request the Board of Directors to:

1. Implement and/or increase activity on each of the nine MacBride principles and,

2. Report to the shareholders by September 1986 on the company's progress in their implementation including statistical information on the religious distribution of its overall workforce in Northern Ireland, its supervisory and managerial staff, personnel office staff, skilled workers, unskilled workers, clerical staff and apprentices.

*Complaint* ¶ 13.

*Goldin Affidavit In Support of Motion for Preliminary Injunction,* Exhibit 1.

The parties failed to reach a settlement, and on April 3, 1986, Brands commenced the mailing of its proxy materials, which excluded NYCERS' proposal. Thereupon, NYCERS instituted this action.

Plaintiff argues that the SEC's no-action letter does not represent an adjudication of the dispute between NYCERS and defendant and that plaintiff is entitled to bring a private right of action to enforce its shareholder proposal rights under Rule 14a–8 before this court. Secondly, plaintiff asserts that the wrongful exclusion of NYCERS' proposal from defendant's proxy statement would result in irreparable harm to plaintiff, as it would deprive plaintiff of any meaningful opportunity to inform other shareholders about the content of, and reasons for, the shareholder proposal. Lastly, plaintiff argues that its proposal is legal under the law of Northern Ireland, and hence cannot be omitted from defendant's proxy statement on the basis of Rule 14a–8(c)(2).

■ The threshold inquiry is whether a private right of action may be instituted for alleged violations of Rule 14a–8. Defendant argues that no such private right of action exists. Although defendant concedes that the United States Supreme Court in *J.I. Case Co. v. Borak,* 377 U.S. 426, 84 S.Ct. 1555, 12 L.Ed.2d 423 (1964), recognized an implied private right of action against management under § 14(a) when the claim involved a misleading statement or omission in proxy materials in violation of Rule 14a–9(a), 17 C.F.R. § 240.-14a–9,[3] defendant posits that an implied right of action under Rule 14a–8 is unnec-

essary to effectuate Congress' purpose in enacting § 14. I disagree.

Although the Supreme Court in *Borak* did not consider whether an implied right of action also exists for alleged violations of 14a–8, it portrayed Congress' enactment of § 14 as breathing life into the idea of corporate democracy:

> The purpose of § 14(a) is to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation. The section stemmed from the congressional belief that "[f]air corporate suffrage is an important right that should attach to every equity security bought on a public exchange." H.R.Rep. No. 1383, 73rd Cong., 2d Sess., 13. It was intended to "control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which ... [had] frustrated the free exercise of the voting rights of stockholders." Id., at 14. "Too often proxies are solicited without explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought." S.Rep. No. 792, 73d Cong., 2d Sess., 12.

*J.I. Case Co. v. Borak, supra,* 377 U.S. at 431, 84 S.Ct. at 1559.

In implying a private right of action in *Borak,* the Supreme Court emphasized that the SEC examines—in an expedited fashion—over 2,000 proxy statements annually so that "[p]rivate enforcement of the proxy rules provides a necessary supplement to Commission action [since] the possibility of civil damages or injunctive relief serves as a most effective weapon in the enforcement of the proxy requirements."[4] *J.I. Case*

---

**3.** SEC Rule 14a–9, 17 C.F.R. § 240.14a–9 provides:

> *False or misleading statements.* No solicitation subject to §§ 240.14a–1 to 240.14a–10 shall be made by means of any proxy statement, form of proxy, notice of meeting, or other communication written or oral containing any statement which at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the

statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false of misleading.

**4.** In a more recent statement from the SEC staff, the number of proxy statements reviewed in fiscal year 1974 was put at more than 6,700. *SEC Release No.* 34–12599 at 5 (July 7, 1976).

*Co. v. Borak, supra,* 377 U.S. at 432, 84 S.Ct. at 1560.

The court takes issue with defendant that the purpose served by Rule 14a–8's shareholder proposal provision is not akin to Rule 14a–9's requirement of full and fair corporate disclosure regarding management proxy materials. Since a shareholder may present a proposal at the annual meeting regardless of whether the proposal is included in a proxy solicitation, the corporate circulation of proxy materials which fail to make reference to a shareholder's intention to present a proper proposal at the annual meeting renders the solicitation inherently misleading. Rule 14a–8's requirement that when management solicits proxies from shareholders who will not attend the meeting, it must include all resolutions proposed to it, unless certain conditions are met, is imposed to encourage shareholder democracy and to prevent management from misleading shareholders by failing to inform them of proposals on which management intends to use its proxy. *See Medical Committee for Human Rights v. SEC,* 432 F.2d 659, 676–77 (D.C.Cir.1970), *vacated and remanded as moot,* 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972).

Several private actions to enforce Rule 14a–8 have been successfully instituted in this court. *Mougios v. W.R. Grace & Co.,* [1970–71 Decisions] Fed.Sec.L.Rep. (CCH) ¶ 93,038 at 90,845–46 (S.D.N.Y.1971) (Tenney, J.); *Brooks v. Standard Oil Co.,* 308 F.Supp. 810 (S.D.N.Y.1969) (Lasker, J.); *Curtin v. Am. Tel. & Tel. Co.,* 124 F.Supp. 197 (S.D.N.Y.) (Knox, J.), *aff'd per curiam* (2d Cir.1954) (unreported); *Peck v. Greyhound Corp.,* 97 F.Supp. 679 (S.D.N.Y. 1951) (Ryan, J.).

Although *Rauchman v. Mobil Corp.,* 739 F.2d 205 (6th Cir.1984), cited by defendant, voices "substantial reservations," the court assumed for the purposes of its decision that an implied private cause of action existed under § 14(a), even when it is premised upon an alleged violation of Rule 14a–8, rather than Rule 14a–9, *id.* at 208, noting at least two other recent Supreme Court decisions which have recognized an implied right of action under § 14(a): *TSC Indus-*

*tries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *Mills v. Electric AutoLite Co.,* 396 U.S. 375, 90 S.Ct. 616, 24 L.Ed.2d 593 (1970).

Further, the SEC has explicitly indicated that nothing stated in the SEC staff's informal cursory analysis of management's intention to omit shareholder proposals from its proxy materials affects a shareholder's right to institute a private right of action. *SEC Release No.* 34–12599 at 8 (July 7, 1976) ("the ultimate decision as to whether a shareholder proposal will be omitted from an issuer's proxy materials must be made by the management, although, as previously noted, that decision is subject to review by a district court in the event appropriate enforcement action is instituted by either the Commission or the proponent [of the proposal].")

In this case, the SEC staff attached to its no-action letter a copy of its informal procedures regarding shareholder proposals, which states that the SEC staff's discretionary determination not to recommend enforcement action to the full Commission "does not preclude the proponent from pursuing any rights he may have against the company in a district court should the management omit the proposals from the company's proxy statement." *Goldin Affidavit In Support of Motion for Preliminary Injunction,* Exhibit 1.

In light of *Borak,* and the decisions of this court vindicating a private right of action brought to contest the exclusion of shareholder proposals, we conclude that NYCERS can seek an interpretation of Rule 14a–8 as applied to its particular proposal in this court.

The standard for issuance of a preliminary injunction in this circuit is the showing of "(a) irreparable harm, and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy, Inc. v. H.P. Hood & Sons Inc.,* 596 F.2d 70, 72 (2d Cir.1979).

Irreparable harm occurs "where there is a continuing wrong which cannot be adequately redressed by final relief on the merits." *New York Pathological and X-Ray Laboratories, Inc. v. Immigration and Naturalization Service*, 523 F.2d 79, 81 (2d Cir.1975). Brands claims that NYCERS cannot claim irreparable injury because the court possesses the power to order the resolicitation of proxies if plaintiff ultimately prevails on the merits at trial, *Defendant's Memorandum of Law in Opposition to Motion for Preliminary Injunction* at 42, and cites decisions by this court in which the shareholders failed to obtain preliminary relief. These cases are inapposite.

In *Catalano v. Trans World Corporation*, No. 83 Civ. 1771, slip op. (S.D.N.Y. March 18, 1983) (Brieant, J.) plaintiffs—family members—unsuccessfully sought an order requiring six separate proposals to be included in a proxy solicitation, contrary to SEC regulations which permit only two. To the extent the proposals suggested waste, corporate wrongdoing, or management's breach of fiduciary duty, the court held that plaintiff shareholders had an "adequate remedy without recourse to the Annual Shareholders Meeting or the proxy solicitation materials." *Id.* at 5. The court suggested that plaintiffs request that the Board of Directors bring a lawsuit against the malefactors and, if that request is denied, bring a derivative shareholder action.

In *Mougious v. W.R. Grace & Co.*, [1970–71 Decisions] Fed.Sec.L.Rep. (CCH) ¶ 93,038 at 90,845–46 (S.D.N.Y.1971) (Tenney, J.), the omitted stockholder resolution proposed a censure of management for allegedly selling a subsidary at a $32 million loss. The court, in denying injunctive relief, found that plaintiff failed to show irreparable harm—that his claim would be moot—if his proposal was not presented at the annual meeting and that his likelihood of success was minimal as he had been guilty of laches. Furthermore, the court indicated that the shareholder might be masking his personal grievance against management in the form of a shareholder resolution since the shareholder was a claimant of a "finder's fee" arising out of the very sale which was the basis of the proposed censure and the shareholder had filed suit against the corporation in a state court in an attempt to recover the alleged fee. Thus, another forum was available for the shareholder's personal underlying grievance with management.

Defendant also cites *Peck v. Greyhound Corp., supra*, 97 F.Supp. at 680 (S.D.N.Y. 1951) (Ryan, J.), in which the court denied plaintiff's request to enjoin defendant from soliciting and obtaining proxies unless plaintiff's proposal was included in the proxy material and on the agenda of the next stockholder meeting. Plaintiff's proposal recommended that management consider the advisability of abolishing the segregated seating system in the South. However, *Peck* is easily distinguishable in that the shareholder's proposal was held not to be proper under a then existing SEC regulation which permitted exclusion of a proposal from proxy statements "with respect to matters which are of a general political, social, or economic nature." *SEC Rel.* No. 34–3638 (Jan. 3, 1945).

Brands also cites cases denying injunctive relief for alleged violations of Rule 14a–9. In each of these cases, the shareholder was unable to meet the standards for preliminary relief by either not alleging irreparable harm or by appearing to have no likelihood of success at a final hearing. *Kennecott Copper Corp. v. Curtiss-Wright Corp.*, 584 F.2d 1195, 1200 (2d Cir. 1978), involved a proxy fight between Curtiss-Wright Corporation ("Curtiss-Wright"), a minority shareholder of Kennecott Copper Corporation, ("Kennecott") and the incumbent management of Kennecott. Curtiss-Wright had announced its own slate of candidates for directors and a campaign platform which contained a plan to distribute to shareholders proceeds of a certain sale Kennecott had made. The district court enjoined Curtiss-Wright from voting its shares and proxies while permitting the annual meeting to go forward. The basis for the district court's preliminary injunction was its holding that Curtiss-Wright had solicited materially false or misleading proxy statements, finding that its disclaim-

er of having conducted a "detailed study" of its proposed distribution plan misled other shareholders to believe that the feasibility of the proposed plan had been at least "thoroughly studied." The circuit in staying the injunction, found that although a disclaimer composed of the words "thoroughly investigated" would have been more descriptive than "detailed study," Curtiss-Wright's usage of the latter term conveyed a sufficiently accurate picture so as not to mislead the shareholders.

In the instant case—involving an omitted shareholder proposal—the issue is not mere poor craftsmanship of a proxy solicitation statement which could have been, but need not be, improved, but rather a total omission of a proposal, whose omission, if a violation of 14a–8, will mislead shareholders not in attendance at the annual shareholder's meeting.

In *Plant Industries, Inc. v. Bregman,* 490 F.Supp. 265 (S.D.N.Y.1980) (Weinfeld, J.) the current management sought an injunction to prevent a group of shareholders who were waging a proxy fight against the current management and directors with regard to the election of directors from voting at the forthcoming annual meeting any proxies they had received or would receive based upon alleged misleading proxy statements. Labeling the plaintiff's claim with respect to misleading language in the challenged proxy statement as "nit-picking," *id.* at 270, the court denied the injunction, holding that the application for injunction was without evidential support, founded largely upon "disputed conversations and events which are not specified and from which plaintiff seeks to draw unreasonable inferences as to what they actually are." *Id.* at 266.

Finally in *Sherman v. Posner,* 266 F.Supp. 871 (S.D.N.Y.1966) (Cannella, J.), the court denied plaintiff shareholder's request to enjoin consummation of an exchange offer made by defendant corporation to the shareholders of another corporation despite the allegations by plaintiff that defendant corporation's proxy solicitation was false and misleading. There the court emphasized that if a preliminary injunction were granted, it would irreparably injure

defendant corporation's exchange offer, since "no matter how clearly it was indicated otherwise, the issuance of the injunction undoubtedly would be viewed by some [of the shareholders of both corporations involved] as a favorable adjudication of plaintiff's claims. This would be tantamount to a determination of wrongdoing on the part of defendant's management." *Id.* at 874. The court felt that if the plaintiff's claim was proven unfounded after a full hearing, no remedy could be afforded the defendant, as the exchange offer would have already expired.

In this case, there is no third party whose actions will be affected by a grant of preliminary relief. If upon a full hearing this court were to find the MacBride Principles violated Northern Ireland law, the company would simply not implement the shareholder proposal. On the other hand, if the MacBride Principles are found to be legal, the shareholders will have been apprised of the principles prior to the annual meeting.

Brands further argues that plaintiff will be able to seek to resubmit its proposal at future Brand's shareholder meetings so long as it remains a shareholder. This argument fails to recognize the uniqueness of each annual shareholder meeting. The shareholder proposal rule is perhaps the only means by which a shareholder has any realistic chance of being taken seriously by the management of a large, publicly-held corporation, or of exercising, along with his fellow shareholders, any meaningful corporate suffrage. Thus, irreparable harm occurs to a shareholder whose proposal is wrongfully excluded from management's proxy solicitation because the shareholder loses the "opportunity to communicate his concern with those shareholders not attending the upcoming shareholder meeting." *Lovenheim v. Iroquois Brands, Ltd.,* 618 F.Supp. 554, 561 (D.D.C.1985). Whether or not NYCERS' resolution is likely to pass, absent a preliminary injunction NYCERS will be irreparably harmed if it is wrongfully barred from communicating its proposal to those shareholders not attending the upcoming shareholder meeting. In view of

Brands' opinion that the proposal is against the law of Northern Ireland, it is likely that management intends to vote against NY-CERS' proposal, and will be able to register opposing votes by utilizing proxies of many shareholders who were never informed of NYCERS' proposal.

Brands argues that it has already incurred substantial expense in printing and mailing its proxy materials in preparation for its annual meeting. Granting NY-CERS' injunctive relief does not entail enjoining the annual shareholder meeting; rather, NYCERS asks the court to order a supplemental solicitation for the annual meeting. This requested relief will not substantially harm Brands, since if preliminary relief was not granted, and this court after trial on the merits ordered solicitation solely on NYCERS' proposal, the same expense would be incurred by Brands.

Brands claims that NYCERS' proposal requires violation of the Fair Employment (Northern Ireland) Act 1976 ("FEA") and hence was properly excludable from its proxy solicitation under Rule 14a–8(c)(2) because three of the MacBride Principles [5]—one, seven, and eight—which the proposal requests that Brands implement in its Northern Ireland factory, alleg-

edly would require discrimination against the Protestant majority religious group.[6]

The determination of whether plaintiff is likely to prevail on the merits of its claim that implementation of the MacBride Principles would not be illegal requires a brief view first of the legislative history and relevant text of the FEA, and what employer action seems required by the contested MacBride Principles.

A concise legislative history of the FEA set out in the affidavit of Christopher McCrudden, a legal commentator on Northern Ireland Law, reads as follows:

> Prior to 1976, neither common law nor statute made discrimination by private sector employers unlawful in Northern Ireland. A Working Party was established by the United Kingdom Government in 1972 "to consider what steps whether in regard to law or practice should be taken to counter religious discrimination where it may exist in the private sector of employment in Northern Ireland.
>
> \*  \*  \*  \*  \*  \*
>
> The Working Party reported in May 1973 and recommended ... that anti-discrimination legislation be introduced... [.] This report was accepted by the United Kingdom Government, which promised to

---

**5.** Although Brands' *Memorandum of Law* at 26 states that it does not concede the legality of any of the MacBride Principles, at oral argument Brands' counsel admitted that Brands believed that "some of them [the MacBride Principles] are [contrary to Northern Ireland law] and some are not." *Prelim. Hearing Trans.* at 18. Although Brands has orally argued and briefed its objections to only principles 1, 7, and 8, and the court feels that the legality of only these three principles is at issue, for purposes of explaining the MacBride Principles, all nine are discussed.

**6.** Brands argues that in determining plaintiff's likelihood of success on the merits, the court should restrict its inquiry to a determination of whether the SEC staff's no-action letter to Brands had some basis, rather than evaluate the merits of movant's case. Although the court recognizes that in evaluating a movant's probability of success on the merits in a securities case, courts not only look at the record before them but additionally may evaluate the inaction or approval of the SEC with regard to the chal-

lenge of proxy materials, *D–Z Investment Co. v. Holloway*, [1973–74 Decisions] Fed.Sec.L.Rep. (CCH) ¶ 94,588 at 96,061 (S.D.N.Y.1974) (Cannella, J.), a court does not abdicate its usual task of considering the merits of movant's argument.

The SEC staff does not claim to have expertise in analyzing foreign anti-discrimination laws. In fact, the SEC admits that because of its limited staff and the need for rapid examination of proxy solicitation statements, the SEC staff "necessarily cannot do more in each case than make a quick analysis of the material submitted that, perforce, lacks the kind of indepth study that would be essential to a definitive determination whether a particular filing complies with the rules." *SEC Release* No. 34–12599 at 5–6 (July 7, 1976). That the SEC staff's views on shareholder proposals are only rendered as an informal convenience to both management and proponents is clear by the SEC's assertion that "The Commission and its staff do not issue rulings or decisions on shareholder proposals ... and consequently the Commission does not engage in any formal proceedings in connection with shareholder proposals." *Id.* at 6.

implement its recommendations. This was achieved in the [FEA]. This is a statute of the United Kingdom Parliament although it extends only to Northern Ireland.

The FEA is divided into three parts. Part I establishes the Fair Employment Agency (the "Agency"), a counterpart to our Equal Employment Opportunity Commission, which has the duty of "promoting equality of opportunity in Northern Ireland," and "working for the elimination of discrimination which is unlawful by virtue of this Act." *McCrudden Affidavit*, Appendix 1 at 1(1)(a)(b). The FEA defines "equality of opportunity" as meaning "equality of opportunity between persons of different religious beliefs," *id.* at 3(1).

Part II of the FEA specifically empowers the Agency to conduct investigations into the religious composition of groups of employees, recruits, applicants, and of recruitment and admission practices to enable it to "ascertain[ ] the existence, nature and extent of failures to afford equality of opportunity," and to "consider[ ] what action, if any, for promoting equality of opportunity, ought to be taken by . . . any employer, or . . . any employment agency, or . . any vocational organisation, or . . . any person who provides services in connection with training for employment . . . ." *Id.* at 12(1)(a)(b)(i)–(v).

Part II's identification of patterns and trends of religion in employment and its encouragement of equality of opportunity echoes the Working Party report—the creative and intellectual springboard for the FEA—which acknowledged that affirmative action was necessary to correct *de facto* inequality:

It is not sufficient, however, simply to adopt measures for the discouragement of discrimination in the future. It is important also to take constructive action which will help to rectify such inequality of opportunity as may have arisen in the past.

*Id.*, Appendix 2 at ¶ 67.

The Working Party's report distinguished affirmative action from quotas explaining,

[Affirmative action] involve[s] deliberate programmes under which equality of employment opportunities may be achieved. It sets out consciously and systematically to create this equality. It acknowledges that, in this way, employment proportions by and large will automatically reflect the denominated ratios in the community as a whole.

*Id.*, Appendix 2 at ¶ 69.

The last integral part of the FEA defines and describes unlawful discrimination in employment, and the administrative investigation and conciliation of complaints.

Three of the MacBride Principles merely restate requirements under the FEA. (Principle 2, "Adequate security for the protection of minority employees both at the workplace and while to and from work," and FEA § 17); (Principle 5, "Layoffs, recall and termination procedures should not, in practice, favor particular religious grouping," and FEA § 17); (Principle 6, "The abolition of job reservations, apprenticeship restrictions, and differential employment criteria, which discriminate on the basis of relgion or ethnic origin," and FEA § 17).

Two of the MacBride Principles require action going beyond the requirements of the FEA but do not raise arguable violations of the legislation. Principle 3 bans provocative religious or political emblems from the workplace. The "Guide to Man-Power Policy and Practice," prepared by the Department of Economic Development, under § 5 of FEA, provides that management should discourage—in a non-discriminatory fashion—the display of flags and emblems "which are likely to give offense or cause apprehension amongst employees." *Id.*, Appendix 3 at 15. Principle 9 calls for the appointment of a senior management staff member to oversee the company's affirmative action efforts and set up timetables to carry out affirmative action principles. Again, the Manpower Employment Guide calls for the appointment of senior management to oversee the policy of affording, "equality of opportunity in employment," by regularly reviewing

employment practices to ensure that they are "completely non-discriminatory and afford equality of opportunity." *Id.* at 16.

The four remaining MacBride Principles may be interpreted as requiring some form of affirmative action. Principle 4, which Brands has not argued is contrary to the FEA, calls for all job openings to be publicly advertised and special recruitment efforts to attract applicants from underrepresented religious groups. This is consistent with FEA § 12(2)(b), as it allows remedying of practices which fail to afford equality of opportunity. Nothing in Principle 4 mandates discrimination against Protestants, it only states that where there is an underrepresentation of Catholics, employment recruiters should make an affirmative effort to seek out Catholic applicants, who but for prior discrimination, would not be underrepresented in that employer's workforce. In its Seventh Annual Report the Agency commented on affirmative action job recruiting as follows:

> [E]mployers reputed to favour Protestants do not attract applicants from Roman Catholics and vice versa. Such employers have a special responsibility to sell themselves to the whole community as equal opportunity employers and this may mean a biased choice of advertising media to attract application from the section of the community badly represented in the workforce.

*McCrudden Affidavit,* at 32–33.

The remaining three MacBride Principles, which Brands has opposed, read as follows:

1. Increasing the representation of individuals from underrepresented religious groups in the workforce including managerial, supervisory, administrative, clerical and technical jobs.

7. The development of training programs that will prepare substantial numbers of current minority employees for skilled jobs, including the expansion of the existing programs and the creation of new programs to train, upgrade, and improve the skills of minority employees.

8. The establishment of procedures to assess, identify, and actively recruit minority employees with potential for further advancement.

*Complaint* ¶ 13.

At oral argument on the motion for preliminary injunction, counsel for Brands argued that the FEA requires an employer to wear "blinders" as to the religion of employees or potential employees; therefore, Brands concludes that because the MacBride Principles call for "religious-conscious" procedures and decisions to aid Catholics, Protestants would face discrimination.

First, the court disagrees with Brands' premise that the FEA calls for an employer to wear "blinders" as to the religious composition of the workplace or applicant pool. Plaintiff's expert on Northern Ireland law cites several instances of employer affirmative action programs, either established or condoned by the FEA Agency. The FEA Agency after an investigation of the Northern Ireland Electricity Service recommended that the employer must adopt an affirmative action program, including the following provisions:

> (i) Set an objective for each recruitment to attract applicants in numbers which reflect the religious profile of the community ...
> [.] (ii) Examine results of each recruitment so that a significant divergence by reference to religion in the rates of appointment from the rates of application may be noted and explanations sought. *FEA, Sixth Annual Report* at 26.

*McCrudden Affidavit* at 34. In 1983, another Company agreed to an affirmative action program following an Agency investigation. That agreement provided in relevant part:

> 5. The Company will continue by all practical means to encourage job application from Catholics. It is part of the affirmative action programme that such efforts will be sustained over a number of years ....

*Id.* at 34.

Second, although MacBride Principles 1, 7 and 8 may be viewed as calling for af-

firmative action, they do not call for discrimination against anyone. The MacBride Principles, akin to the FEA, look to underrepresented minority employees, applicants, and potential applicants who are underrepresented in the workplace by virtue of their membership in the minority religion and encourage employers to undertake voluntary positive steps in addressing this underrepresentation. That voluntary compliance with this goal of equal opportunity was meant to be the backbone of the FEA, rather than an illegal act in violation of the FEA, is voiced by the Working Party's report on what steps private employers should voluntarily take to counter religious discrimination where it exists in the private sector:

> We propose that affirmative action programmes should be initiated *both on a voluntary basis by employers and at the instigation and, if necessary, at the requirement of the Fair Employment Agency.*

*McCrudden Affidavit,* Appendix 2 at ¶ 68.

Defendant's narrow interpretation of the prohibition of unlawful discrimination in §§ 16 and 17 of Part III of the FEA, ignores the need to interpret Part III of the FEA in the context of the FEA as a whole, so as not to make a nullity of the "equality of opportunity" provisions in Part II of the FEA.

Defendant relies on the Affidavit of Reginald Wilson, Assistant Secretary in the Department of Economic Development ("DED") to support its view that MacBride Principles 1, 7 and 8 are incompatible with the FEA. Attached to Wilson's Affidavit is a Statement from the Industrial Development Board ("IDB"), a body which functions as a part of the DED. Although DED is in charge of appointing members to the Agency administering the FEA, *McCrudden Affidavit,* Appendix 1 § 5., the IDB has "no expertise in, or responsibility for the interpretation of the Act." *McCrudden Affidavit* at 40. Even if the court were to give deference to IDB's memorandum on "Fair Employment in Northern Ireland and the MacBride Principles"—which purports to be a view of the British Government on the MacBride Prin-

ciples—it merely states that "in view of the progress already made in the provision of fair employment in Northern Ireland ... the British Government considers the MacBride Principles to be unnecessary and their adoption undesirable." *Wilson Affidavit,* IDB Memorandum ¶ 5. Although the memorandum goes on to say that the FEA has found MacBride Principles 7, 8, and possibly 1, to be objectionable as they require "preferential and discriminatory treatment," the IDB has not cited to any document or public statement to that effect produced by the Agency involved with the implementation of the FEA. The reliability of these statements (purportedly made by, or on behalf of the FEA Agency) is questionable; therefore, they are not entitled to much, if any, weight. The FEA Agency as a body has apparently produced no formal public statement of its construction of the FEA in terms of its consistency with the MacBride Principles. Although the Agency has issued no formal pronouncements on the MacBride Principles, it has broadly interpreted the extent of permissible action permitted an employer under the FEA.

Moreover, although entitled to no legal weight, the economic and public policy grounds that the IDB memorandum gives for opposing the MacBride Principles—the principles would allegedly "damage the climate for badly needed U.S. investment in Northern Ireland" *Wilson Affidavit in Opposition to Motion for Preliminary Injunction* at § 6—are not at all clear. As the facts of this case reveal, pension funds of public employees might be divested from companies operating in Northern Ireland *unless* shareholder proposals regarding management implementation of the MacBride Principles are incorporated into management's proxy statement.

■ Plaintiff has made a strong showing of the likelihood of success on the merits—that upon a full trial it could prove that all nine of the MacBride Principles could be legally implemented by management in its Northern Ireland factory.

Plaintiff's motion for a preliminary injunction is granted. Brands is enjoined

from soliciting shareholder proxies for defendant's 1986 annual meeting without informing shareholders of plaintiff's shareholder proposal; is enjoined from employing proxies solicited in such a manner; and is further directed to make a supplemental mailing to inform shareholders about, and to solicit proxies on, the plaintiff's shareholder proposal.

IT IS SO ORDERED.