**The NEW YORK CITY EMPLOYEES' RETIREMENT SYSTEM, Plaintiff,**

v.

**DOLE FOOD COMPANY, INC., Defendant.**

**No. 92 CIV 2551 (KC).**

United States District Court, S.D. New York.

April 24, 1992.

Hillary Klein and Steve Stein Cushman, Asst. Corp. Counsel, New York City, for plaintiff.

Andrew J. Frackman and Achilles Perry, O'Melveny & Myers, New York City, for defendant.

## MEMORANDUM & ORDER

CONBOY, District Judge:

Proceeding by an order to show cause, the New York City Employees' Retirement System ("NYCERS") brings this action for a preliminary injunction that would enjoin defendant Dole Food Company, Inc. ("Dole") from the solicitation of shareholder proxies for Dole's upcoming annual meeting without informing shareholders of

NYCERS' shareholder proposal. In the alternative, NYCERS seeks inclusion of the proposal on a supplemental mailing prior to the annual meeting.

## I. *Background*

NYCERS is a public pension fund that owns approximately 164,841 shares of common stock in Dole Food Company, Inc. ("Dole"). Affidavit of Elizabeth Holtzman Dated April 8, 1992 ("Holtzman Afft.") ¶ 3. On December 12, 1991, New York City Comptroller Elizabeth Holtzman, in her capacity as the custodian of NYCERS' assets, wrote to the executive vice president of Dole, requesting Dole to include the following proposal ("the NYCERS proposal") in its proxy statement prior to its annual meeting:

NEW YORK CITY EMPLOYEE'S [*sic.*] RETIREMENT SYSTEM

SHAREHOLDER RESOLUTION ON HEALTH CARE

TO DOLE FOOD COMPANY, INC.

WHEREAS: The Dole Food Company is concerned with remaining competitive in the domestic and world marketplace, acknowledging the positive relationship between the health and well being of its employees and productivity, and the resulting effect on corporate growth and financial stability; and

WHEREAS: Sustained double-digit increases in health care costs have put severe financial pressure on a company attempting to continue to provide adequate health care for its employees and their dependents; and

WHEREAS: The company has a societal obligation to conduct its affairs in a way which promotes the health and well being of all;

BE IT THEREFORE RESOLVED: That the shareholders request the Board of Directors to establish a committee of the Board consisting of outside and independent directors for the purpose of evaluating the impact of a representative cross section of the various health care reform proposals being considered by national policy makers on the company and their [*sic.*] competitive standing in domestic and international markets. These various proposals can be grouped in three generic categories; the single payor model (as in the Canadian plan), the limited payor (as in the Pepper Commission Report) and the employer mandated (as in the Kennedy–Waxman legislation).

Further, the aforementioned committee should be directed to prepare a report of its findings. The report should be prepared in a reasonable time, at a reasonable cost and should be made available to any shareholder upon written request.

### SUPPORTING STATEMENT

Our nation is now at a crossroads on health care. Because of cutbacks in public programs, jobs that offer no benefits and efforts by employers to shift health care costs to workers, 50 million Americans have health care coverage that is inadequate to meet their needs and another 37 million have no protection at all.

The United States spends $2 billion a day, or eleven percent of its gross national product, on health care. As insurance premiums increase 18 to 30 percent a year, basic health care has moved well beyond the reach of a growing number of working families. This increase also places heavy pressure on employer labor costs. There is no end in sight to this trend.

As a result and because of the significant social and public policy issues attendant to operations involving health care, we urge shareholders to SUPPORT the resolution. Holtzman Afft., Exhibit B (emphasis in original).

On January 16, 1992, J. Brett Tibbitts, deputy general counsel of Dole Food Company, Inc., wrote to the office of chief counsel of the Securities & Exchange Commission's ("SEC") division of corporation finance and stated Dole's position that Dole could exclude the NYCERS proposal from its proxy statement because the proposal concerned employee benefits, an assertedly "ordinary business operation," and both SEC regulations and the law of the Dole's

state of incorporation relegate such ordinary business operations to management, not shareholder, control.

On February 10, 1992, John Brousseau, special counsel to the SEC's division of corporation finance, responded to Tibbitts' letter with the following written statement:

The proposal relates to the preparation of a report by a Committee of the Company's Board of Directors to evaluate various health-care proposals being considered by national policy makers.

There appears to be some basis for your view that the proposal may be excluded pursuant to rule 14a–8(c)(7) because the proposal is directed at involving the Company in the political or legislative process relating to an aspect of the Company's operations. Accordingly, we will not recommend enforcement action to the Commission if the proposal is omitted from the Company's proxy materials. In reaching a position, the staff has not found it necessary to address the alternative basis for omission on which the Company relies. Holtzman Afft., Exhibit D.

On March 19, 1992, Brousseau reported to NYCERS that the SEC had denied NYCERS' request for the SEC to review the SEC staff determination on the NYCERS proposal. Holtzman Afft., Exhibit E. On April 9, 1992, NYCERS brought the instant action. In conjunction with NYCERS' request for an order to show cause, NYCERS submitted an affidavit of Theodore R. Marmor, a professor of political science and public policy at Yale University. In his affidavit, Professor Marmor averred, *inter alia,* that (1) at least 37 million Americans have no health insurance; (2) the United States spends more on health *per capita* than any other developed nation; (3) health care expenditures in 1989 represented 56 percent of pre-tax company profits in 1989, as compared to 8 percent in 1985; and (4) the national average cost for health care per employee is $3,200, and some large companies pay $5,000 or more per employee. Affidavit of Theodore Marmor Dated April 6, 1992 ("Marmor Afft.") at ¶¶ 5, 7, and 10. Professor Marmor also defined and explained the three major categories of national health care proposals pending in Congress:

14. First, there is the so-called "play or pay" model. The Kennedy–Waxman bill pending in Congress adopts this approach. Under this plan, American businesses would be required either to offer health coverage to their employees or to pay a premium to a centralized pool. The pool would be used to ensure that all Americans not covered by their employer would receive some form of health care coverage.

15. Another approach is a unitary funding arrangement, the so-called "single payor" system, and there are proposals pending in Congress modeled on the Canadian health care system. The system creates a single pool of dollars (or its equivalent) that is publicly accountable and that is created through a form of tax or fee. Each year it is determined roughly how much will be spent on health care, and then negotiations take place with physicians, hospitals and other medical institutions over how much they will be paid. Further, a set of comprehensive medical benefits is established, which allows all residents to receive treatment for any medically necessary procedure. This results in less administrative overhead. The plans tend to minimize out-of-pocket expenses from patients, instead of paying for health care out of one pool of funds.

16. A third model is the "limited-payor" approach. This approach was suggested by the Pepper Commission, a bipartisan congressional commission which issued a five-year health care reform plan in September, 1990. The plan would provide small employers with various kinds of tax deductions and credits for purchasing health plans from existing health insurance carriers. For large employers, it would adopt a "play or pay" approach, requiring employers to provide coverage for their employees after purchasing health plans from insurance carriers or by paying for coverage by the federal government. The federal government also would provide coverage for the unemployed and the poor by re-

placing and expanding the role currently performed by states through the Medicaid program. When job-based coverage and the federal program are fully implemented and in place, all individuals would be required to obtain health care coverage either from their employers or the federal program. For both public and private coverage, the Pepper Commission recommended a federally-specified minimum benefit package. Individuals would be responsible for a share of premiums and service costs on all preventative service up to a minimum and subject to their ability to pay. Lower income workers and nonworkers would receive subsidies to keep their contributions low. *Id.* at ¶¶ 12–16 (emphasis supplied).

## II. *Discussion*

■ A party seeking a preliminary injunction must normally establish a) irreparable harm and b) either a substantial likelihood of success on the merits, or sufficiently serious questions on the merits to make them fair grounds for litigation with a balance of hardships tipping decidedly toward the moving party. *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985). In this case, NYCERS must prove a substantial likelihood of success on the merits because NYCERS requests a so-called mandatory injunction, *i.e.*, one that disturbs the *status quo*, and the relief that NYCERS seeks from the preliminary injunction is identical to that sought as the ultimate relief in the action. *Abdul Wali*, 754 F.2d at 1025–26.

### A. Substantial Likelihood of Success on the Merits

The federal securities regulation that governs proposals of securities holders is 17 CFR § 240.14a–8 ("Rule 14a–8"). Rule 14(a)–8(a) states in pertinent part:

If any security holder of a registrant notifies the registrant of his intention to present a proposal for action at a forthcoming meeting of the registrant's security holders, the registrant shall set forth the proposal in its proxy statement....

However, Rule 14(a)–8(c) allows a corporation to omit a shareholder proposal from its proxy statement because of certain enumerated circumstances. In substance, Dole argues that the instant matter fits within the "ordinary business operations," "insignificant relation," and "beyond power to effectuate" exceptions enumerated in Rule 14(a)–8(c) [1].

The corporation has the burden to show that a proposal fits within an exception to Rule 14(a)–8(a). *See Austin v. Consolidated Edison Co. of New York*, 788 F.Supp. 192, 194 (S.D.N.Y.1992); SEC Adoption of Amendments to Proxy Rules, Securities Exchange Act of 1934, Release No. 4979, 1954 SEC LEXIS 38, *7 (discussing Rule X–14A–8(c)(5); "[t]he rule places the burden of proof upon the management to show that a particular security holder's proposal is not a proper one for inclusion in management's proxy material"). Our determination on this matter also takes into account NYCERS' own burden, as discussed above, of demonstrating a "substantial" likelihood of success on the merits. *Abdul Wali*, 754 F.2d at 1025–26.

On April 16, this Court held a hearing pursuant to NYCERS' request for a mandatory injunction. At the hearing, counsel for both parties elaborated on the legal arguments that they had submitted in their papers, but neither party produced any witnesses, or any proof by affidavit of the nature of Dole's employee health care programs, coverage, costs, union agreements or insurance contracts. Indeed, the argument and the parties' briefs were largely abstract in nature. Nevertheless, for the reasons stated below, we find that NYCERS has met its burden of showing that

---

**1.** In its letter of January 16, 1992 to the SEC, Dole objected to NYCERS' proposal in part on the ground that the proposal violated the provision of Hawaii law that states that a company's board of directors has exclusive control over the establishment of committees and the choice of which directors will serve on committees. The SEC staff "no-action" letter did not address this argument, and Dole did not raise this argument in its papers or at the hearing before the Court; accordingly, we do not consider it.

it is substantially likely that Dole would fail to show on the merits that the proposal falls within one of the enumerated exceptions.

### 1. Rule 14a–8(c)(7): "Ordinary Business Operations"

■ Rule 14a–8(c)(7) states that a corporation may exclude a shareholder proposal from a proxy statement

[i]f the proposal deals with a matter relating to the conduct of the ordinary business operations of the registrant[2].

The term "ordinary business operations" is neither self-explanatory nor easy to explain. The exception does not elaborate on whether "business operations" encompass merely certain routine internal functions or whether they can extend to cost-benefit analyses or profit-making activity. The SEC's commentary on the current version of the "ordinary business operations" exception states, "[W]here proposals involve business matters that are mundane in nature *and* do not involve any substantial policy or other considerations, the sub-paragraph may be relied upon to omit them." Adoption of Amendments Relating to Proposals by Security Holders, 41 Fed.Reg. 52,994, 52,998 (1976) (emphasis added). This commentary indicates that even if the proposal touches on the way daily business matters are conducted, the statement may not be excluded if it involves a significant strategic decision as to those daily business matters, *i.e.*, one that will significantly affect the manner in which a company does business. One Court has held that the purpose of the "ordinary business exception" is to prevent shareholders from seeking to "assert the power to dictate the minutiae of daily business decisions." *Grimes v. Centerior Energy Corp.*, 909 F.2d 529, 531 (D.C.Cir.1990), *cert. denied,* —— U.S. ——, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991)[3].

While we give due deference to the SEC staff opinion letter in this case and other similar cases, we find that NYCERS has shown under that the proposal does not relate to "ordinary business operations." If one aspect of "ordinary business operations" is certain, it is that the outcome of close cases such as the instant one are largely fact-dependent[4]. Nevertheless, Dole has not provided the Court with any information on (1) whether Dole has a health insurance program; (2) if such a program exists at Dole, how it operates; and (3) the amount of corporate financial resources that Dole devotes to health insurance. Instead, Dole argues, "To the extent [the NYCER proposal] relates to Dole's business at all, it relates to its employee relations and health care benefits, a matter traditionally within the "ordinary business" category. Memorandum of Law of Dole Food Company, Inc. In Opposition to Plaintiff's Motion For A Preliminary Injunction ("Dole Memo") at 10. In support of its position, Dole cites several SEC "No–Action" letters relating to proposals similar to the instant one. However, the SEC "No–Action" letters contain scarcely any analysis, and, while they are entitled to defer-

---

**2.** In 1983, the SEC stated that although the SEC had previously deemed requests for the corporation to prepare reports on specific aspects of their business to be not excludable under Rule 14a–8(c)(7), "[h]enceforth, the staff will consider whether the subject matter of the special report or the committee involves a matter of ordinary business; where it does, the proposal will be excludable under Rule 14a–8(c)(7)." Exchange Act Release No. 20091 (August 13, 1983).

**3.** In addition to the SEC commentary, state corporate law is an authority on the nature of ordinary business operations. Hearings on SEC Enforcement Problems Before a Subcommittee of the Senate Committee on Banking and Currency, 85th Cong. 1st Session at 118 (1957), quoted in *Medical Committee for Human Rights v. Securities & Exchange Commission*, 432 F.2d 659, 678 (D.C.Cir.1970), *vacated as moot,* 404

U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972). However, the parties have not supplied the Court with any law of Dole's state of incorporation, Hawaii, on the subject of whether a proposal such as the one in the instant case concerns an ordinary business operation that is the responsibility of management.

**4.** *See Amelia Roosevelt v. E.I. Dupont De Nemours & Company*, 958 F.2d 416 (D.C.Cir.1992) (shareholder proposal relating to Du Pont's production of chlorofluorocarbons and halons required a rapid phase out of production of these chemicals, whereas Du Pont had already planned that the phase out would take longer; therefore the proposal and the proposed report on the same subject related to timing and implementation, and, accordingly, were properly excluded.)

ence, they do not bind this Court. We note that the SEC itself has changed its reasoning as to why proposals relating to national employee health insurance relate to "ordinary business relations." The SEC has shifted rationales for rejecting proposals such as this one, initially stressing the "employee relations" aspect of national health insurance and then emphasizing its "political [and] legislative" dimensions [5].

We further find that the principal cases relied upon by Dole are distinguishable from the instant case. *Austin v. Consolidated Edison Co. of New York*, 788 F.Supp. 192 (S.D.N.Y.1992) involved an internal, relatively mundane plan to change the eligibility criteria of a company's specific retirement benefits policy, a subject of union collective bargaining. *Austin*, at 193. As Professor Marmor's affidavit demonstrates, however, the proposals in the instant case relate to a strategic policy choice as to the prospect of a major outlay to the federal treasury, as well as possible internal changes that may affect the entire scope of Dole's employee health insurance policy. *See Pacific Telesis Group*, 1989 WL 245523, 1989 No–Act LEXIS 104 at *1 (February 2, 1989) [6]. The question of which plan, if any, that Dole should support, and how Dole would choose to function under the plans (*e.g.*, "pay or play") could have large financial consequences on Dole. The instant case is also distinguishable from *New York City Employees' Re-*

*tirement System v. Brunswick Corporation*, 789 F.Supp. 144 (S.D.N.Y.1992). In *Brunswick*, the NYCERS submitted a vague proposal that the company 1) study the national health plans in those countries in which the company had subsidiaries and 2) describe any aspect of these foreign health plans that should be included in the development of a national health insurance plan in the United States. *Brunswick* at 145. Unlike the proposal in Brunswick, the proposal in the instant case does not seek to involve the corporation in making abstract political proposals but rather requests the corporation to study existing, concrete plans before Congress that affect the scope of Dole's health insurance operations.

The proposed report primarily relates to Dole's policy making on an issue of social significance that, while not relating to a specific health care policy at Dole, nevertheless relates to a distinct type of operations that Dole has undoubtedly grappled with in the past. *See e.g. Pacific Telesis Group*, 1989 WL 245523, 1989 SEC No–Act. LEXIS 104, *supra*, at note 6. Accordingly, we do not find that the instant proposal relates to "ordinary business operations."

### 2. *Rule 14a–8(c)(5): "Insignificant Relationship" Exception*

■ Rule 14a–8(c)(5) states that a corporation may exclude a shareholder proposal from a proxy statement

**5.** *Compare Knight–Ridder Inc.*, 1991 WL 176516, 1991 SEC No–Act LEXIS 65 ("employee health and welfare plans are matters involving the Company's ordinary business operations") (January 23, 1991); *Minnesota Mining and Manufacturing Company*, 1991 WL 176604, 1991 SEC No–Act. LEXIS 195 (February 6, 1991) (same); *Pepsico Inc.*, 1991 WL 178559, 1991 SEC No–Act LEXIS 427 (March 7, 1991) (same) *with Brunswick Corporation*, 1992 WL 30687, 1992 SEC No–Act. LEXIS 158 (February 4, 1992) ("the proposal is directed at involving the Company in the political or legislative process relating to an aspect of the Company's operations"); *Dole Food Company, Inc.*, 1992 WL 30692, 1992 SEC No–Act. LEXIS 154 (February 10, 1992) (same).

**6.** The subject of the SEC "No–Action" letter in *Pacific–Telesis Group* was the impact of the company's facilities' closings on surrounding communities:

In light of recent developments, including heightened state and federal interest in the social and economic implications of plant closing and relocation decisions, the staff has reconsidered its position with respect to the applicability of Rule 14a–8(c)(7) to proposals dealing generally with the broad social and economic impact of plant closings or relocations. It is the Division's view that such proposals, including the one that is the subject of the Company's letter, involve substantial corporate policy considerations that go beyond the conduct of the Company's ordinary business operations. Accordingly, we do not believe that the Company may rely on Rule 14a–8(c)(7) as a basis for omitting the proposal from its proxy material. The staff's revised position, however, would not apply to proposals concerning the specific decisions regarding the closing or relocation of particular plant facilities. *Pacific–Telesis*, 1989 WL 245523, 1989 SEC No–Act. LEXIS 104 at *1.

[i]f the proposal relates to operations which account for less than 5 percent of the registrant's total assets at the end of its most recent fiscal year, and for less than 5 percent of its net earnings and gross sales for its most recent fiscal year, *and* is not otherwise significantly related to the registrant's business. (emphasis supplied).

Dole does not dispute that the clear language of the NYCERS proposal in large part relates to national health insurance's impact on Dole. Without specific reference to Rule 14a–8(c)(5), Dole argues that the NYCERS proposal lacked a discrete nexus to Dole's distinct line of business, presumably the manufacture of food products. Dole's argument is essentially made under the exception referred to in the last phrase of Rule 14a–8(c)(5), *i.e.*, that the proposal is "not otherwise significantly related to the registrant's business." Dole Food Company, Inc.'s Supplemental Memorandum of Law in Opposition to Plaintiff's Motion for a Preliminary Injunction ("Dole Supplemental Memo") at 3–7.

We need not address Dole's "nexus" argument because we find the activity addressed by the NYCERS proposal relates to activities that likely occupy outlays more than five percent of Dole's income. It is substantially likely that Dole's health insurance outlays constitute more than five percent of its income[7]. Dole has offered no information on the percentage of its income that it devotes to employee health insurance. In his affidavit, Professor Marmor stated that nationwide, 1989 health care expenditures represented 56 percent of pre-tax company profits. Marmor Afft. ¶ 5. We find it substantially likely that this figure applies to Dole to a greater or lesser extent. Because the subject of the proposed study likely relates to a significant aspect of Dole's business, we find that the proposal does not fall within the exception stated in Rule 14(a)–8(c)(5).

### 3. *Rule 14(a)–8(c)(6): "Beyond Power to Effectuate" Exception*

■ Rule 14(a)–8(c)(6) states that a corporation need not include a shareholder proposal on a proxy statement

[i]f the proposal deals with a matter beyond the registrant's power to effectuate....

Dole argues, "The NYCERS proposal requests the analysis of, and implicitly suggests that Dole should attempt to influence the selection of, national health care re-

---

**7.** However, even if we did address Dole's "nexus" argument, we note there is no authority that establishes that a proposal that does not relate to a corporation's distinct line of business automatically falls within the Rule 14a–8(c)(5) exception. The SEC commentary on the unacceptable nature of abstract political proposals, such as against antitrust laws in general, *see* Securities Exchange Act Release No. 3638, (January 3, 1945), cited in *Medical Committee for Human Rights v. Securities & Exchange Commission*, 432 F.2d 659, 677 (D.C.Cir.1970), *vacated as moot*, 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972), does not address a proposal such as the instant one, which expressly seeks to study national health insurance's *impact on Dole*. The cases that discuss Rule 14a–8(c)(5) also do not reach this question, because the proposals in those cases directly involved the product manufactured by the corporation. *See Medical Committee*, 432 F.2d at 662 (proposal relating to chemical corporation's production of napalm used against human beings); *Lovenheim v. Iroquois Brands, Ltd.*, 618 F.Supp. 554, 561 (D.D.C. 1985) (proposal relating to pate de fois gras produced by force-feeding geese).

At least one Court and several SEC "no-action" letters that do not specifically address Rule 14a–8(c)(5) have allowed proposals that related to policies to be included on proxy proposals despite the seeming lack of a discrete nexus to the corporations' distinct lines of business. *NYCERS v. American Brands, Inc.*, 634 F.Supp. 1382 (S.D.N.Y.1986) (equal employment proposal permitted); *Ruddick Corporation*, 1989 WL 246671, 1989 SEC No–Act. LEXIS 1273 (November 20, 1989) (same); *Mobil Corporation*, 1990 WL 285903 (February 1, 1990) (affirmative action proposal permitted); *Dayton Hudson Corporation*, 1991 WL 178560, 1991 SEC No–Act. LEXIS 428 (March 8, 1991); (same); *Reebok International, Ltd.*, 1992 WL 55815 (March 16, 1992) (executive compensation proposal permitted); *Transamerica Corporation*, 1990 WL 285806, 1990 SEC No–Act. LEXIS 46 (January 10, 1990) (same); *Baxter International Inc.*, 1991 WL 178484 (February 12, 1991) (proposal investigating corporation's alleged participation in Arab Boycott of Israel permitted); *Nicholas Fund, Inc.*, 1987 WL 107978 (April 29, 1987) (South African investment policy proposal permitted); *Pacific Telesis Group*, 1989 WL 245523, 1989 SEC No–Act. LEXIS 104 (February 2, 1989) (plant closing proposal permitted).

form proposals." Dole Supplemental Memo at 8. However, Dole does not point to any language that suggests that a necessary consequence of the proposal is political lobbying. While couched in language that clearly supports a national solution to the problems of growing health insurance costs, the NYCERS proposal merely calls for the commission of a research report on national health insurance proposals and their impact on Dole's competitive standing. Moreover, we fail to see why such a study necessarily "deals with a matter beyond the registrant's power to effectuate." For example, a decision that Dole's interests mandate a choice to "pay" rather than "play" under two of the three major proposals would clearly be within Dole's power to effectuate if these proposals are enacted. Moreover, Dole might conceivably find that it is in its interests to draft such a proposal and lobby for its enactment. For the reasons stated above, we disagree with Dole's argument that the political aspect of this proposal means that it does not relate to Dole's business in a substantial way.

**B. Irreparable Harm**

■ The exclusion of the NYCERS proposal from the upcoming annual shareholder vote would mean that NYCERS would not be able to bring its proposal to Dole shareholders for another year. We find that Dole has established the required element of irreparable harm. *Cf. NYCERS v. American Brands Inc.*, 634 F.Supp. 1382, 1388 (S.D.N.Y.1986)[8].

Having found that the required showing has been met, this Court directs Dole to include in its proxy materials for its June 4, 1992 annual meeting NYCERS' shareholder proposal submitted to Dole by letter dated December 12, 1991.

SO ORDERED.

---

**8.** Under the above analysis, no inquiry into the balance of hardships is necessary. However, we find that were such an inquiry necessary, the hardship of including the NYCERS proposal is outweighed by the hardship of its exclusion.