AMALGAMATED CLOTHING AND TEX-
TILE WORKERS UNION, National
Council of the Churches of Christ in the
U.S.A., Unitarian Universalist Associa-
tion, and Literary Society of Saint Cath-
erine of Sienna, Plaintiffs,

v.

WAL–MART STORES, INC., Defendant.

No. 92 Civ. 5517 (KMW).

United States District Court,
S.D. New York.

April 26, 1993.

Cornish F. Hitchcock, Alan B. Morrison, Public Citizen Litigation Group, Washington, DC, Hal S. Shaftel, Stein, Zauderer, Ellenhorn, Frischer & Sharp, New York City, Paul M. Neuhauser, Iowa City, IA, for plaintiffs.

Alan L. Dye, George H. Mernick, III, Hogan & Hartson, Washington, DC, Ediberto Roman, Lord Day & Lord, Barrett Smith, New York City, for defendant.

## OPINION AND ORDER

WOOD, District Judge.

On April 19, 1993, the court issued an Order enjoining defendant Wal–Mart Stores, Inc. ("Wal–Mart") from mailing out proxy material omitting plaintiffs' proposed resolution (the "Proposal") as amended by the court. The court's factual and legal findings are set forth below.

 Plaintiffs, Wal–Mart shareholders, sought to enjoin the company from omitting their Proposal from proxy solicitation material the company plans to distribute in advance of Wal–Mart's June 4, 1993 annual meeting. Plaintiffs seek to submit to a shareholder vote a request for Wal–Mart's directors to prepare and distribute reports about Wal–Mart's equal employment opportunity ("EEO") and affirmative action policies, programs and data, along with a description of Wal–Mart's efforts to 1) publicize its EEO policies to suppliers, and 2) purchase goods and services from minority- and female-owned suppliers. Plaintiffs allege that Wal–Mart's omission of their proposal violates Securities and Exchange Commission ("SEC" or "Commission") Rule 14a–8.[1]

Wal–Mart moves to dismiss the Amended Complaint. Wal–Mart asserts that it may exclude the proposal because it "deals with a matter relating to the conduct of [Wal–Mart's] ordinary business operations," an excludable category under Rule 14a–8(c)(7).[2] Plaintiffs cross-move for summary judgment. The court treats the motions as cross-motions for summary judgment.[3] The court

---

1. This court's jurisdiction is predicated generally upon 28 U.S.C. § 1331 and specifically upon § 27 of the Securities Exchange Act of 1934 ("SEA"), which gives federal courts exclusive jurisdiction over all suits "brought to enforce any liability or duty created by this chapter or the rules and regulations thereunder." 15 U.S.C. § 78aa (West's Supp.1992). The existence of a private right of action by a shareholder under § 14(a) of the SEA and Rule 14a–8 is well settled and uncontested here. *See Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 418–25 (D.C.Cir.1992); *New York City Employees' Retirement System v. American Brands, Inc.*, 634 F.Supp. 1382, 1386 (S.D.N.Y.1986).

2. Wal–Mart filed its motion to dismiss the original complaint on September 23, 1992 for lack of subject matter jurisdiction and for failure to state a claim for which relief can be granted. Wal–Mart based its subject matter jurisdiction argument on its view that plaintiffs' claims were either moot with respect to the 1992 meeting or not yet ripe with respect to the 1993 meeting. (Def.Mem.Supp. at 9–13). The original Complaint was filed after Wal–Mart's 1992 annual meeting and before plaintiffs had submitted a proposal to Wal–Mart for inclusion in the 1993 proxy material. Since then, plaintiffs resubmitted their proposal, Wal–Mart rejected it, and plaintiffs filed an Amended Complaint pertaining solely to the upcoming 1993 annual meeting. Wal–Mart stipulated that the current dispute between the parties "is now a ripe, justiciable controversy." (Def.Renewed Mem. at 1). The court concurs. *See American Motorists Ins. Co. v. United Furnace Co.*, 876 F.2d 293, 302 n. 4 (2d Cir.1989) (intervening events after the filing of the original complaint that are relevant to the ripeness inquiry "should be considered and may be determinative").

3. By stipulation of the parties, plaintiffs were permitted to respond to Wal–Mart's motion to dismiss by moving for summary judgment on Oct. 30, 1992. Plaintiffs supplied affidavits containing factual information in support of their motion; Wal–Mart supplied exhibits and other matters outside the pleadings and responded to plaintiffs' Local Rule 3(g) statement "solely for the purpose of responding to, and enabling a

denies Wal–Mart's motion and grants plaintiffs' motion for the reasons, and to the extent, set forth below.

## I. Background

Plaintiff Amalgamated Clothing and Textile Workers Union ("ACTWU") is a labor union representing approximately 250,000 workers internationally. (Amended Complaint at ¶ 3). Plaintiffs National Council of Churches of Christ in the U.S.A., Unitarian Universalist Association and Literary Society of Saint Catherine of Sienna are religious organizations, which invest in socially responsible corporations as part of their religious missions. Each plaintiff believes that "issues concerning equal employment opportunity and affirmative action are important to shareholder value." (*Id.* at ¶¶ 4–6). Plaintiffs' stated ultimate goal is to improve Wal–Mart's EEO record and that of the discount retail store industry; to that end, they submit proposals, such as this one, to foster dialogue between plaintiffs and Wal–Mart and between plaintiffs and other shareholders. (Pls. Ex. 5, 6). Under SEC Rule 14a–8(a)(1), plaintiffs, as owners of at least $1,000 worth of Wal–Mart stock, are eligible to submit proposals for inclusion in Wal–Mart's proxy material. *See* 17 C.F.R. § 240.14a–8(a)(1).

Wal–Mart operates a chain of retail stores throughout the United States. (Amended Complaint at ¶ 7). Wal–Mart is a Delaware corporation with its principal place of business in Bentonville, Arkansas. As a Delaware corporation, Wal–Mart is subject to Delaware corporate law pertaining to the use of shareholder proxies at annual meetings and is concurrently subject to the rules adopted by the SEC, which regulate the content and solicitation of proxies.

Plaintiff ACTWU submitted a proposal to Wal–Mart in 1991 that is substantially similar to the 1993 Proposal at issue here. In 1992, plaintiffs collectively submitted a revised proposal to Wal–Mart that is identical to the 1993 Proposal. Plaintiffs' resubmitted their 1992 proposal for inclusion in Wal–Mart's 1993 proxy material. Wal–Mart refused to include any of the proposals submitted by plaintiffs. The 1993 Proposal requests Wal–Mart's board of directors to prepare the following reports by September 1993:

1. A chart identifying employees according to their sex and race in each of the nine major EEOC defined job categories for 1990, 1991, 1992 listing either numbers or percentages in each category.

2. A summary description of Affirmative Action Programs to improve performance especially in job categories where women and minorities are under utilized and a description of major problems in meeting the company's goals and objectives in this area.

3. A description of steps taken to increase the number of managers who are qualified females and ethnic minorities.

4. A description of ways in which Wal–Mart publicizes our company's policies to merchandise suppliers and service providers to encourage forward action on their part as well.

5. A description of Wal–Mart's efforts to purchase goods and services from minority and female owned business enterprises.[4]

---

resolution of plaintiffs' motion." For these reasons, the court treats the motions as cross-motions for summary judgment. *See Fonte v. Board of Managers of Continental Towers Condominium*, 848 F.2d 24, 25 (2d Cir.1988). The parties agree as to all material facts; their dispute is limited to questions of law. Consequently, this case is appropriate for resolution on summary judgment. *See Brady v. Town of Colchester*, 863 F.2d 205, 210 (2d Cir.1988).

4. The resolution is preceded by the following preamble:

WHEREAS, Wal–Mart is one of the nation's largest employers in what is rapidly becoming a service oriented job market for many Americans;
We believe the vast majority of Wal–Mart's customers are either women or members of a racial minority group.
By the beginning of the next century, the majority of new entrants to our nation's workforce will be women and/or minority group members.
We believe it makes good business sense for Wal–Mart to describe and publicize its employment standards which relate to its core customer groups and potential employees. By publicizing its standards, Wal–Mart will be an example to companies with whom it does business.

Plaintiffs envision a brief report, that could, in their view, range from the one page analysis produced by J.C. Penney as part of its annual report to a five page internal memorandum made available to shareholders of CIGNA Corporation. (Brouse Aff. at ¶ 21 [discussing similar reports of seven different companies] ).

## II. DISCUSSION

### A. Regulatory Framework

#### 1. The Importance of Proxies

A proxy is a means by which a shareholder authorizes another person to represent her and vote her shares at a shareholders' meeting in accordance with the shareholder's instructions on the proxy card. Proxies have become an indispensable part of corporate governance because the "[r]ealities of modern corporate life have all but gutted the myth that shareholders in large publicly held companies personally attend annual meetings." *Stroud v. Grace*, 606 A.2d 75, 86 (Del.1992). As one leading commentator explained, the "widespread distribution of corporate securities, with the concomitant separation of ownership and management, puts the entire concept of the stockholders' meeting at the mercy of the proxy instrument." Louis Loss, *Fundamentals of Securities Regulation* 449 (2d ed. 1988). This is because under state law—Delaware law, in Wal-Mart's case—a quorum of the shares eligible to vote must be represented at an annual meeting either in person or by proxy in order to elect directors and transact "any other proper business" that may be conducted. *See* Del.Code Ann. tit. 8, §§ 211(b), 212(b), 216 (1991). Thus, the failure of the vast majority of shareholders to attend annual meetings means that without the proxy mechanism for representing shares eligible to vote, corporations effectively would be un-

able to elect directors and take other required actions.

#### 2. Shareholder Proposals

Under Delaware law, a shareholder in attendance at the annual meeting may offer a proposal for shareholder approval, as long as the proposal involves a proper subject on which shareholders may vote. *See* Del.Code Ann. tit. 8 § 211(b). "[T]he right of security holders to present proposals at the meeting, as distinguished from the right to include such proposals in management's proxy materials, turns upon state law." *Statement of Informal Procedures for the Rendering of Staff Advice with Respect to Shareholder Proposals*, Exchange Act Release No. 12599, [1976–77 Transfer Binder] *Fed.Sec.L.Reports* ¶ 80,635 at 86,602, 86,604 (July 7, 1976) ("Informal Procedures Release"). Unless the shareholders' proposed resolution is included in the proxy material, however, other shareholders would not have advance notice of the intention to make the proposal or have the ability to vote on the proposal via the proxy. *See Stroud*, 606 A.2d at 87 (Delaware law "does not require the board to disclose ... matters to be discussed at regularly scheduled annual meetings").

#### 3. Proxy Solicitations

Congress delegated to the SEC the task of regulating proxy solicitations and thereby regulating one important avenue of management's communication with shareholders. Section § 14(a) of the Securities Exchange Act of 1934 ("SEA") renders unlawful the solicitation of proxies in violation of the SEC's rules and regulations, which are codified at 17 C.F.R. § 240.14a–1 et seq. Section § 14(a) and the SEC's implementing regulations seek "to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation." *J.I. Case*

---

We share the concern stated by U.S. Labor Department Secretary Lynn Martin who has declared a new goal of challenging the "glass ceiling investigation to remedy this situation."

We believe a report containing basic information requested in this resolution keeps the issue high on management's agenda. It will also reaffirm our public commitment to non-discriminatory employment practices and equal economic opportunity and be responsive to the concerns of

women and minorities. The format of the report requested is not important. Different companies use different styles and levels of detail in telling their story to shareholders. Bristol–Myers, Squibb and Travellers produced a magazine style report. Campbell Soup produced a four page document. GM discloses in its Public Interest Report.

(Pls. Ex. 4 at 2).

*Co. v. Borak*, 377 U.S. 426, 431, 84 S.Ct. 1555, 15, 12 L.Ed.2d 423 (1964). The Senate Report accompanying the SEA noted Congressional concern, at that time, that "[t]oo often proxies are solicited without explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought." S.Rep. No. 792, 73rd Cong., 2d Sess. at 12 (1934). Congress sought to insure "[f]air corporate suffrage," H.Rep. No. 1383, 73rd Cong., 2d Sess. at 13, and shareholders who were "enlightened not only as to the financial condition of the corporation, but also as to the major questions of policy, which are decided at stockholders' meetings." S.Rep. No. 792 at 12. These concerns led the SEC to adopt Rule 14a–9, which prohibits "false or misleading" statements made in any proxy statement, form of proxy, notice of meeting or other communication. 17 C.F.R. § 240.14a–9(a).

The SEC has interpreted Rule 14a–9 to require companies to provide shareholders with the opportunity to submit proposals to management for inclusion in the corporation's proxy material. This interpretation grew out of the desire to ensure that the contents of the proxy statement reflect accurately all the issues that would properly arise at the annual meeting. As Judge Carter has explained:

> [s]ince a shareholder may present a proposal at the annual meeting regardless of whether the proposal is included in a proxy solicitation, the corporate circulation of proxy materials which fail to make reference to a shareholder's intention to present

a proper proposal at the annual meeting renders the solicitation inherently misleading.

*New York City Employees' Retirement System v. American Brands, Inc.*, 634 F.Supp. 1382, 1386 (S.D.N.Y.1986). *See also Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416, 422 (D.C.Cir.1992).

The SEC has also adopted Rule 14a–8, which is "complementary to, but distinct from, the Rule 14a–9 ban on misleading statements in proxy solicitations." *Roosevelt*, 958 F.2d at 421. Rule 14a–8 is "informational," and affords shareholders "[a]ccess to management proxy solicitations to sound out management views and to communicate with other shareholders on matters of major import. . . ." *Id.* *See also Lovenheim v. Iroquois Brands, Ltd.*, 618 F.Supp. 554, 561 (D.D.C.1985).

Rule 14a–8(a) requires a company to include a shareholder's proposal in the company's proxy statement and provide shareholders with the opportunity to vote on the proposal by executing the proxy card. *See* 17 C.F.R. § 240.14a–8(a). This ostensibly broad directive is limited by thirteen content-based exceptions.[5] Most relevant to this case is Rule 14a–8(c)(7), which permits a company to omit a shareholder proposal if "the proposal deals with a matter relating to the conduct of the ordinary business operations of the registrant." 17 C.F.R. § 240.14a–8(c)(7).[6] A shareholder proposal pertaining to "ordinary business operations" would be improper if raised at an annual meeting, because the law

---

**5.** Shareholders seeking to communicate with fellow shareholders have another avenue for doing so, provided by Rule 14a–7. Rule 14a–7 provides that the corporation must mail out a shareholder communication to other shareholders if the shareholder is willing to pay for both the printing and mailing costs. *See* 17 C.F.R. § 240.14a–7(a). Rule 14a–7 imposes no content restriction on the communication and management has no choice but to mail out the statement of shareholder willing to underwrite the cost. In contrast, Rule 14a–8 imposes content restrictions, but a proposal that passes muster is included in a management solicitation at no charge to the shareholder. *See* Patrick J. Ryan, "Rule 14a–8, Institutional Shareholder Proposals, and Corporate Democracy," 23 *Ga.L.Rev.* 97, 108 n. 40 (1988) (discussing interplay between the two rules).

**6.** Other situations in which a shareholder proposal may be omitted are where the proposal: (1) is not a proper subject for action by security holders under the laws of the registrant's domicile, 17 C.F.R. § 240.14a–8(c)(1); (2) would require the registrant to violate the law if implemented, *id.* at § 240.14a–8(c)(2); (3) relates to the redress of a personal grievance, *id.* at § 240.-14a–8(c)(4); (4) relates to operations that do not meet a specified economic level, *id.* at § 240.-14a–8(c)(5); and (5) deals with a matter beyond the registrant's power to effectuate, *id.* at § 240.-14a–8(c)(6). The term "registrant" refers to a company whose securities are registered pursuant to the SEA.

of most states (including Delaware) leaves the conduct of ordinary business operations to corporate directors and officers rather than the shareholders. *See e.g.* Del.Code Ann. tit. 8 § 141(a). As one court explained, "management cannot exercise its specialized talents effectively if corporate investors assert the power to dictate the minutiae of daily business decisions." *Medical Committee for Human Rights v. SEC*, 432 F.2d 659, 679 (D.C.Cir.1970), *vacated as moot*, 404 U.S. 403, 92 S.Ct. 577, 30 L.Ed.2d 560 (1972). The SEC adopted this exception to save management the cost and burden of including a proposal in proxy material that would be improper if raised by a shareholder at the annual meeting. (Def. Ex. F [Address by SEC Commissioner Richard Y. Roberts to American Society of Corporate Secretaries, Oct. 5, 1991] at 6–7).

### 4. SEC Review of Intent to Omit Proposals

A company that objects to the inclusion of a proposal and wishes to omit it from the company's proxy statement must file with the SEC (1) a copy of the proposal, (2) any statement in support of the proposal submitted by the proponent, and (3) a statement of "the reasons why the [company] deems such omission to be proper in the particular case." 17 C.F.R. § 240.14a–8(d). The "burden of proof [is] upon the management to show that a particular security holder's proposal is not a proper one for inclusion in management's proxy material." *Adoption of Amendments to Proxy Rules*, Securities Exchange Act Release No. 4979, 1954 SEC LEXIS 38, *3 (Jan. 6, 1954) ("1954 Amendments") (discussing prior incarnation of Rule 14a–8). *See also New York City Employees' Retirement System v. Dole Food Co.*, 795 F.Supp. 95, 99 (S.D.N.Y), *vacated as moot*, 969 F.2d 1430 (2d Cir.1992); *Austin v. Consolidated Edison Co.*, 788 F.Supp. 192, 194 (S.D.N.Y.1992).

In connection with its submission of the proposal and its objections, a company may ask the SEC to issue a "no-action" letter, in which the SEC staff informs the company whether the SEC believes the shareholder proposal may be omitted and opines on the SEC's enforcement position should the proposal be omitted. *See Informal Procedures Release* at 86,605. A company must notify the SEC of its intention to omit the proposal, but no response from the Commission or its staff is required before the company may mail out proxy material that omits the opposed shareholder proposal. *See id.*

### B. Standard for Court's Determination Whether a Proposal May Be Excluded as Pertaining to "Ordinary Business Operations"

■ Determining whether Wal–Mart may exclude plaintiffs' Proposal under the "ordinary business operations" exception requires the court to construe the meaning of the SEC's own rules. When a court interprets an administrative regulation, "the ultimate criterion" is the agency's interpretation of the regulation, which becomes of controlling weight unless that interpretation is "plainly erroneous or inconsistent with the regulation." *Bowles v. Seminole Rock & Sand Co.*, 325 U.S. 410, 414, 65 S.Ct. 1215, 1217, 89 L.Ed. 1700 (1945). *See also Mullins Coal Co. v. Director, O.W.C.P.*, 484 U.S. 135, 159, 108 S.Ct. 427, 439, 98 L.Ed.2d 450 (1987); *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555, 566, 100 S.Ct. 790, 797, 63 L.Ed.2d 22 (1980); *New York City Employees' Retirement System v. Dole Food Co.*, 969 F.2d 1430, 1435 (2d Cir.1992) (Pollack, J., sitting by designation, concurring). Thus before deciding whether Wal–Mart may omit the Proposal on the basis of the "ordinary business operations" exception, I must first examine how the SEC interprets Rule 14a–8(c)(7).

### 1. The SEC's Interpretive Release Standard

Both the present form of Rule 14a–8, which contains the phrase "ordinary business operations," and the SEC Interpretive Release that accompanied it, were adopted after a formal notice and comment rule-making period in 1976. *See Proposed Amendments to Rule 14a–8 under the SEA Relating to Proposals by Security Holders*, Exchange Act Release No. 12598 [1976–77 Transfer Binder] *Fed.Sec.L.Reports* ¶ 80,634 at 86,593 (Jul. 7, 1976). The 1976 Release "established the principles by which [the Commission] intended the 'ordinary business' provision of

Rule 14a–8 to be interpreted." *Brief of the Securities and Exchange Commission, Amicus Curiae* at 29, *filed in Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416 (D.C.Cir.1992). Writing in January 1992, the SEC stated that "[t]hese principles are no less applicable today than when the Commission adopted them" in 1976. *Id.*

■ The SEC issued the 1976 Interpretive Release to resolve previous interpretive difficulties over Rule 14a–8(c)(7)'s intended meaning. The Release states in pertinent part that

the term "ordinary business operations" has been deemed on occasion to include certain matters which have significant policy, economic or other implications inherent in them. For instance, a proposal that a utility company not construct a proposed nuclear power plant has in the past been considered excludable.... In retrospect, however, it seems apparent that the economic and safety considerations attendant to nuclear power plants are of such magnitude that a determination whether to construct one is not an "ordinary" business matter. Accordingly, proposals of that nature as well as others having major implications be considered beyond the realm of an issuer's ordinary business operations, and future interpretive letters of the Commission's staff will reflect that view.

... Thus, **where proposals involve business matters that are mundane in nature and do not involve any substantial policy or other considerations, the sub-**paragraph **may be relied upon to omit them.**

*Adoption of Amendments Relating to Proposals by Security Holders*, Exchange Act Release No. 12999, 41 Fed.Reg. 52,994, 52,-998 (Dec. 3, 1976) ("1976 Interpretive Release") (emphasis added).[7]

### 2. Development of SEC Interpretation Through No–Action Letter Review Process

■ The general guidance provided to parties and the court by the 1976 Interpretive Release and state corporate law has been supplemented by the no-action letters issued by the SEC staff and the rare discretionary review of no-action letters provided by the full Commission.[8] No-action letters can provide insight into the meaning of the term "ordinary business operations," because, unlike general interpretive releases, no-action letters address specific issues and build upon the SEC's "vast experience of daily contact with the practical workings of this rule." *Peck v. Greyhound Corp.*, 97 F.Supp. 679, 681 (S.D.N.Y.1951) (involving former exception for proposals of a "general, political, social, or economic nature"). However, as the SEC itself maintains, the *ad hoc* nature of these letters means that courts cannot place them on a precedential par with formal rulemaking or adjudication. Before turning to how the SEC has applied Rule 14a–8(c)(7) to similar proposals through numerous no-action letters, the court will, therefore, address the extent to which it

**7.** The law of the company's state of incorporation is also a source of authority as to which proposals relate to "ordinary business operations" under Rule 14a–8(c)(7) and which proposals are "proper subject for action by shareholders" under Rule 14a–8(c)(1). *See Medical Committee for Human Rights*, 432 F.2d at 678 (discussing Senate hearings on SEC enforcement problems); *Dole Food*, 795 F.Supp. at 100 n. 3; Def. Ex. F. [Address by Richard Y. Roberts to American Society of Corporate Secretaries, Oct. 5, 1991] at 8. However, most states, including Delaware, have not developed the law on this issue beyond the statement that the directors and officers shall manage the business affairs of the corporation. *See* Del.Code Ann. tit. 8 § 141(a). In practice over the last half century the SEC rather than state courts have been determining whether proposals may be excluded on these

bases. *See* Louis Loss & Joel Seligman, 4 *Securities Regulation* 2012 (3rd ed. 1990) (SEC staff develops a "common law" of includable proposals).

**8.** Shareholders and management have no right to appeal staff advice to the Commission, although the Commission may, in its discretion, grant a party's request for review. *See Informal Procedures Release* at 86,605–06; 17 C.F.R. § 202.1(d). The position of the full Commission in affirming or reversing a staff determination is also informal, *see* 17 C.F.R. § 202.1(d), and does not "affect[] the right of ... a shareholder ... to institute a private action with respect to the management's intention to omit the proposal from its proxy materials." *Informal Procedures Release* at 86,604.

must defer to positions taken in no-action letters.

### a. Deference Owed to No-Action Position

■ An individual no-action letter by itself is not an expression of agency interpretation to which the court must defer. *See Roosevelt,* 958 F.2d at 427 n. 19 (principle of deference to administrative regulation is not applicable to an SEC no-action letter regarding shareholder proposals because no-action letter does not "rank[ ] as an agency adjudication or rulemaking"); *Dole Food,* 795 F.Supp. at 100–01 (SEC no-action letters do not bind court).[9] By responding to a company's request for a no-action letter, the "Commission and its staff do not purport in any way to issue 'rulings' or 'decisions' on shareholder proposals management indicates it intends to omit, and they do not adjudicate the merits of a management's posture concerning such a proposal." *Informal Procedures Release* at 86,604.

The SEC staff reviews annually approximately 350 requests for no-action letters regarding shareholder proposals and over 6,700 proxy statements, *see Roosevelt,* 958 F.2d at 424; *Informal Procedures Release* at 86,604, and itself acknowledges that its staff "necessarily cannot do more in each case than make a quick analysis of the material submitted

that, perforce, lacks the kind of in-depth study that would be essential to a definitive determination...." *Id.* at 86,604. Time and staff constraints require the staff to evaluate a shareholder proposal as an indivisible whole; if one part of a multi-part proposal is excludable, the entire proposal is treated as excludable. *See id.,* 958 F.2d at 427 n. 17 (at the request of the Court of Appeals for the D.C. Circuit, Commission re-evaluated a two-part proposal and found the first part includable and second part excludable; the staff originally deemed the entire proposal excludable).[10] The administrative constraints on the SEC staff led the agency to express concern at its inability to enforce § 14(a) on its own through the informal no-action letter process, and it has acknowledged a need for its efforts to be supplemented by private enforcement in the courts. *See Roosevelt,* 958 F.2d at 424.

■ However, although the court need not defer to an individual no-action position, courts have relied on the consistency of the SEC staff's position and reasoning on a given issue, or the lack of consistency, in determining whether a proposal that was deemed excludable by the SEC staff can in fact be omitted under Rule 14a–8(c)(7). *Compare Austin,* 788 F.Supp. 192, 195 (deferring to position expressed in more than fifty no-action letters over ten years that proposals

9. Although in the past courts in this district have relied on the SEC's determination that the particular proposal before the court could be excluded, without referring to other no-action letters or case law, these decisions pre-date the SEC's explanation of the role of its informal review process and pre-date the D.C. Circuit's clear statement in *Roosevelt* that no-action letters do not merit the deference afforded formal rulemaking and agency adjudication. *See, e.g., Brooks,* 308 F.Supp. 810, 813 (S.D.N.Y.1969); *Peck v. Greyhound Corp.,* 97 F.Supp. 679, 681 (S.D.N.Y. 1951).

10. In the employment policy area, *compare Capital Cities Communications, Inc.,* 1984 WL 45007 (Mar. 14, 1984) (company may omit proposal requesting EEO data as well as overall company policy on employee fringe benefits generally); *Transamerica Corp.,* 1986 WL 66511 (Jan. 22, 1986) (company may omit proposal requesting directors to develop code of conduct pertaining to community and government relations as well as equal employment opportunity); *Capital Cities/ABC,* 1987 WL 107813 (Mar. 23, 1987) (company may omit a proposal that included a re-

quest for a report on criteria regarding utilization of racial minorities and women in acting roles and production crews as well as a report on policies and processes designed to ensure accuracy of dramatizations in television programming) *with General Electric Co.,* SEC No–Action Letter, 1991 WL 176574, 1991 SEC No–Act. LEXIS 143 (Jan. 25, 1991); *CBS, Inc.,* SEC No–Action Letter, 1991 WL 178540, 1991 SEC No–Act. LEXIS 437 (Mar. 7, 1991); *Capital Cities/ABC,* 1991 WL 178565, 1991 SEC No–Act. LEXIS 422 (Mar. 7, 1991) (companies may not omit a proposal that requested both EEO information about its own employees and their efforts to make program content more responsive to women and minorities).

On April 4, 1991, the full Commission reversed the staff position in *Capital Cities,* finding that the proposal "involves a request for detailed information on the composition of the company's work force, employment practices and policies, and selection of program content." (Def. Ex. P at 1).

relating to pension plans may be excluded as related to "ordinary course of business") *with I.N.S. v. Cardoza Fonseca,* 480 U.S. 421, 447 n. 30, 107 S.Ct. 1207, 1221 n. 3, 94 L.Ed.2d 434 (1987) (an agency interpretation that conflicts with the agency's earlier interpretation is entitled to considerably less deference than a consistently held agency view) (citations omitted); *Dole Food,* 795 F.Supp. at 101 (deference to no-action letter less warranted when SEC shifted rationales for excluding proposals on national health insurance). *But see Dole Food,* 969 F.2d at 1436 (Pollack, J., concurring) (deferring to SEC's position on health care reform as clearly expressed in twelve no-action letters issued within two years).

■ In determining whether to defer to a position drawn from a series of no-action letters, courts must recognize that a change in SEC position does not necessarily reveal capricious action by the agency; changes in conditions and public perceptions justify changes in the SEC's construction of the "ordinary business operations" exception. The nature of the exception permits, if not requires, the SEC to reevaluate earlier positions "in light of new considerations, or changing conditions which indicate that its earlier views are no longer in keeping with the objectives of Rule 14a–8." *Informal Procedures Release* at 86,605. The SEC has revised its position with respect to the inclusion of proposals on a number of issues formerly excludable under Rule 14a–8(c)(7) such as plant closings, tobacco production, cigarette advertising and all forms of senior executive and director compensation. *See* Lynne L. Dallas, "The Control and Conflict of Interest Voting Systems," 71 *N.C.L.Rev.* 1, 14–16 n. 55 (1992) (collecting recent changes in SEC no-action positions). In announcing the change in the Commission's position on senior executive and director compensation, SEC Chairman Breeden stated that the "the level of public and shareholder concern ... has become intense and widespread" and "dictates a reevaluation" of SEC policy. "Breeden Announces SEC Initiative on Executive Compensation Issues," 24 *Securities Reg. & L.Rep.* (BNA) 223 (Feb. 21, 1992). Thus, an SEC departure from a prior position must be considered in light of changing

public and shareholder concerns. Having addressed the various considerations that help to determine the level of deference owed to no-action letters, the court now examines the SEC's interpretation of the "ordinary business operations" exception in its no-action letters dealing with similar EEO and affirmative action proposals.

### b. SEC's No–Action Letter Position on Ordinary Business Operations

Although the SEC has been dealing with proposals like plaintiffs' since the mid–1970s, its treatment of these proposals has changed over time. Prior to 1983, the SEC took the position that proposals requesting reports on EEO data and policies could not be excluded, because the determination whether a *report* should be issued was matter of policy rather than ordinary business operations. *See, e.g., Continental Airlines, Inc.,* SEC No–Action Letter, 1975 WL 9901, 1975 SEC No–Act, LEXIS 559, *1, *6 (Mar. 12, 1975); (company may not exclude proposal requesting report on EEO policies and data); *Columbia Pictures Industries, Inc.,* SEC No–Action Letter, 1975 WL 9958, 1975 SEC No–Act. LEXIS 1791 *7, *10 (Aug. 29, 1975) (same); *Gulf & Western Industries, Inc.,* SEC No–Action Letter, 1975 WL 9969, 1975 SEC No–Act. LEXIS 2212 *8—*9, *11 (Oct. 23, 1975) (same). In 1983, the SEC changed its interpretation of the exception and determined that the *subject* of the report requested, rather than the fact that the information requested was in the form of a *report,* would determine the proposal's excludability under the "ordinary business operations" exception. *See Amendments to Rule 14a–8 Under the Securities Exchange Act of 1934 Relating to Proposals by Security Holders,* Exchange Act Release No. 20091, [1983–84 Transfer Binder] *Fed.Sec.L.Rep.* ¶ 83,417, at 86,200, 86,205 (Aug. 16, 1983).

Since 1983, the SEC has determined whether employment policy proposals must be included in proxy materials by examining whether the proposals relate to "day-to-day" employment matters and, therefore, are excludable as relating to "ordinary business operations," or whether the proposals relate to significant policy considerations and,

therefore, are not excludable. Day-to-day employment matters have been interpreted as including matters concerning: employee health benefits, general compensation issues not focused on senior executives, management of the workplace, employee supervision, labor-management relations, employee hiring and firing, conditions of employment and employee training and motivation. *See, e.g., United Technologies Co.,* SEC No–Action Letter, 1993 WL 48821, 1993 SEC No–Act. LEXIS 288 (Feb. 19, 1993) (SEC staff listing of excludable subjects of proposals based on past no-action letters). The SEC has also viewed a proposal requesting a company to hire contractors from within its service area as excludable under Rule 14a–8(c)(7). *See Atlantic Energy, Inc.,* SEC No–Action Letter, 1989 WL 245614 (Feb. 17, 1989).

Despite the SEC's general view that employee hiring and firing and supplier decisions are related to a company's ordinary business operations, the SEC has until recently recognized that the issues of EEO and affirmative action raise policy considerations elevating them above the excludable day-to-day issues. Thus, in 1988, the SEC staff stated, and the full Commission affirmed, that AT & T may not exclude a shareholder proposal to phase out those aspects of AT & T's affirmative action program directed toward recruiting, employing or promoting individuals from any particular racial or ethnic group. *See American Telephone & Telegraph Co.,* SEC No–Action Letter, 1988 WL 235275 at 15 (Dec. 21, 1988). The staff stated that AT & T could not rely on the exception for "ordinary business operations" because the proposal involved "policy issues," described by the SEC staff as "the Company's affirmative action program, designed to assure equal employment opportunities for minority group members...." *Id.,* 1988 WL 235275 at 15–16. *See also Ruddick Corporation,* SEC No–Action Letter, 1989 WL 246671 at 13 (Nov. 20, 1989) (proposal that the company take steps to ensure that it respects "federal" rights in such matters as employment discrimination and union partic-

ipation deemed non-excludable because its "subject matter" addressed "policy matters" that preclude omission).

Similarly, on February 14, 1991, the SEC took the position that a proposal requesting the publication of EEO data and the adoption of an affirmative action program and a program for purchasing from vendors controlled by women and minorities was not excludable, because it related to "general policy decisions which are beyond the conduct of the Company's day-to-day operations." *V.F. Corp.,* SEC No–Action Letter, 1991 WL 178525, 1991 SEC No–Act. LEXIS 238 (Feb. 14, 1991).

In the same vein, on March 8, 1991 the SEC reviewed a proposal that was *identical* to a proposal plaintiff ACTWU submitted to Wal–Mart in 1991, and contained four of the five requests included in the 1993 Proposal at issue here. The SEC took the position that although the proposal "concerns employment and other matters that involve the Company's ordinary business operations, ... questions with respect to equal employment opportunity and affirmative action involve policy decisions beyond those personnel matters that constitute the Company's ordinary course of business." *Dayton Hudson Corp.,* SEC No–Action Letter, 1991 WL 178560, 1991 SEC No–Act. LEXIS 428 (Mar. 8, 1991).

Thus, through March 1991, the SEC's no-action letters determined that companies could not exclude proposals requesting the information requested in plaintiffs' Proposal here. On April 4, 1991, however, the full Commission appeared to shift position, and voted 3–2 to reverse the staff position stated in a no-action letter issued to Capital Cities/ABC. The proposal there requested information quite similar to that requested here in plaintiffs' 1993 Proposal, although a notable difference is that in *Capital Cities/ABC,* the proposal requested a summary of timetables to implement affirmative action programs.[11] The divided Commission deter-

---

**11.** The proposal in *Capital Cities/ABC* requested:

1) a breakdown by race and sex of all employees in each of the nine major EEOC job catego-

ries for 1988, 1989 and 1990 (equivalent to Proposal request in part 1);

2) a summary of affirmative action programs and timetables to implement these programs,

mined that the proposal was excludable because it "involves a request for detailed information on the composition of the company's work force, employment practices and policies, and the selection of program content." (Def. Ex. P at 1 [Letter from Secretary of SEC to General Counsel of Capital Cities/ABC] Apr. 4, 1991).

On April 10, 1991, six days after the Commission's decision in *Capital Cities/ABC,* the SEC staff issued Wal–Mart a no-action letter with respect to ACTWU's 1991 proposal, relying on the rationale of *Capital Cities/ABC.* The SEC's views on the issues raised in the 1991 proposal are unclear, because the staff based its conclusion partly on an erroneous characterization of the proposal. The SEC incorrectly construed the request that the board of directors publicize Wal–Mart's EEO and affirmative action policies to Wal–Mart's suppliers as requesting "detailed information on the ... Company's practices and policies for selecting suppliers of goods and services." *Wal–Mart Stores, Inc.,* SEC No–Action Letter, 1991 WL 178759, 1991 SEC No–Act. LEXIS 572 (Apr. 10, 1991) (emphasis added).

After the Commission's decision in *Capital Cities/ABC,* the parties there reached a settlement whereby the shareholder proponents withdrew their petition for review of the Commission's action in the Court of Appeals for the District of Columbia Circuit. In exchange, Capital Cities/ABC agreed not to object to the shareholder proponents' request to vacate the Commission's April 4, 1991 letter. By letter dated July 15, 1991, the Commission agreed to vacate its earlier action (Def. Ex. R [Letter from Secretary of SEC to General Counsel of Capital Cities/ABC] July 15, 1991), rendering the decision of no precedential value, according to Richard Y. Roberts, one of the SEC Commis-

sioners. (*See* Def. Ex. F [Address by Richard Y. Roberts to American Society of Corporate Secretaries, Oct. 5, 1991] at 12).[12]

On April 10, 1992, the staff issued Wal–Mart a no-action letter with respect to plaintiffs' 1992 proposal, also relying on the rationale of *Capital Cities/ABC,* notwithstanding that the Commission had earlier vacated its decision in *Capital Cities/ABC.* The letter to Wal–Mart stated that the Division would not recommend an enforcement action to the SEC if Wal–Mart excluded plaintiffs' proposal from its 1992 proxy materials because there appeared "some basis" for Wal–Mart's omission of the proposal, because the proposal "involves a request for detailed information on the composition of the Company's work-force, its employment practices and policies as well as its relationships with suppliers and other businesses." (*Wal–Mart Stores, Inc.,* SEC No–Action Letter, 1992 WL 178127, 1992 SEC No–Act. LEXIS 574 (Apr. 10, 1992)). Wal–Mart, thereafter, omitted plaintiffs' proposal from its 1992 proxy materials.

In October 1992 the SEC staff expressed in more sweeping terms the view that companies could exclude EEO proposals, reversing the position it took in *AT & T* in 1988 and *Dayton Hudson* in 1991. *See Cracker Barrel Old Country Stores, Inc.,* No–Action Letter, 1992 WL 289095, 1992 SEC No–Act. LEXIS 984, *43 (Oct. 13, 1992). The articulated reason for that decision was that the SEC found distinctions between policies implicating broad social issues and the conduct of day-to-day business simply too hard to draw as regards the employment of the general workforce. The shareholder proposal in *Cracker Barrel* was prompted by that company's announcement of a policy to discriminate against gay men and lesbians. The proposal

and a description of major problems in meeting the goals of these programs (substantially similar to Proposal request in part 2 except for the reference to a timetable);

 3) a description of the actions taken with the producers of television programming to increase the number of female and ethnic minority writers, producers and directors; (substantially similar to Proposal request in part 3); and

 4) a description of the actions taken to ensure that the content of those programs is responsive to the concerns of women and minorities.

(Def. Ex. N at 1–2; *Capital Cities/ABC,* 1991 WL 178565, 1991 SEC No–Act. LEXIS 422 (Mar. 7, 1991).

**12.** The significance of this statement is unclear in light of the SEC's position that "because the staff's advice on contested proposals is informal and nonjudicial in nature, it does not have precedential value with respect to identical or similar proposals submitted to other issuers in the future." *Informal Procedures Release* at 86,604.

asked the corporation (1) to include sexual orientation in its anti-discrimination policy, and (2) to enforce its amended policy. *See Cracker Barrel,* 1992 SEC No–Act. LEXIS 984, *42. The SEC staff and later the Commission characterized the proposal as requesting that the directors "implement hiring policies relating to sexual orientation and incorporate such policies into the corporate employment policy statement." *Id.* at *2–*3. Based on this characterization of the proposal, the SEC staff explained:

> Notwithstanding the general view that employment matters concerning the workforce of the company are excludable as matters involving the conduct of day-to-day business, exceptions have been made in some cases where a proponent based an employment-related proposal on "social policy" concerns. In recent years, however, **the line between includable and excludable employment-related proposals based on social policy considerations has become increasingly difficult to draw.** The distinctions recognized by the staff are characterized by many as tenuous, without substance and effectively nullifying the application of the ordinary business exclusion to employment-related proposals.
>
> The Division has reconsidered the application of Rule 14a–8(c)(7) to employment-related proposals in light of these concerns and the staff's experience with these proposals in recent years. As a result, the Division has determined that **the fact that a shareholder proposal concerning a company's employment policies and practices for the general workforce is tied to a social issue will no longer be viewed as removing the proposal from the realm of ordinary business operations** of the registrant. Rather, determinations with respect to any such proposals are properly governed by the employment-based nature of the proposal.

*Id.* at *2–*3 (emphasis added). On January 15, 1993, the Commission affirmed the Division's position that the proposal was excludable from the Company's proxy material, relying on Rule 14a–8(c)(7), without any further elaboration on the staff's rationale for its determination. (Def. Ex. 1 to Supplemental

Mem. [Letter from Secretary of SEC to Deputy Counsel, Office of the Comptroller of New York City] Jan. 15, 1993).

During 1993 the SEC staff issued several no-action letters on shareholder proposals involving employment-related matters. In each case, including those raising EEO issues, the staff decided that the proposal was excludable based on its view that the proposal was "principally directed at the Company's employment policies and practices which are matters relating to the conduct of ordinary business operations." *See e.g. Wal–Mart Stores, Inc.,* SEC No–Action Letter, 1993 WL 107957, 1993 SEC No–Act. LEXIS 588 (Mar. 26, 1993); *GTE Corp.,* 1993 WL 54309, 1993 SEC No–Act. LEXIS 322 (Feb. 25, 1993); *United Technologies Co.,* SEC No–Action Letter, 1993 WL 48821, 1993 SEC No–Act. LEXIS 288 (Feb. 19, 1993); *Unisys Corp.,* SEC No–Action Letter, 1993 WL 48814, 1993 SEC No–Act. LEXIS 270 (Feb. 19, 1993).

Thus, the SEC's current no-action position is that it can no longer continue to draw the lines between includable and excludable proposals that it drew in *AT & T, Ruddick Corp., V.F. Corp.* and *Dayton Hudson.* As a result, shareholder proposals involving EEO and affirmative action policies are now deemed excludable by the SEC because they relate to employment policies, and employment policies are viewed as ordinary business matters.

### C. Whether Wal–Mart May Exclude Plaintiffs' Proposal

Having considered the SEC's formal interpretive guidelines for Rule 14a–8 and the SEC's application of those guidelines through the no-action letter process, the court turns to whether Wal–Mart carries its burden of showing that the Proposal may be excluded from management's proxy material because it falls within the "ordinary business operations" exception. *See 1954 Amendments,* 1954 SEC LEXIS 38, *3. Wal–Mart first contends that the court should defer to *Cracker Barrel* and the 1993 Wal–Mart no-action letter, which categorically reject the SEC's prior position on EEO and affirmative

action proposals. It alternatively contends that the Proposal's request for "detailed" information about Wal–Mart's employee and supplier relations involves shareholders in the details of implementing rather than adopting corporate policy, and that the Proposal is thus excludable because the choice between ways to implement corporate policy is mundane in nature and does not involve substantial policy considerations.

### 1. Whether the Court Should Defer to the SEC's Cracker Barrel Position

 The court does not defer to the SEC's position in Cracker Barrel and is not persuaded by its reasoning, because the reasoning in Cracker Barrel sharply deviates from the standard articulated in the 1976 Interpretive Release. The parties, the SEC and courts all agree that courts must defer to the 1976 Interpretive Release. See Pls.Mem. Supp. at 10–14; Def.Mem.Sup. at 18; Brief of Securities Exchange Commission, Amicus Curiae at 30, filed in Roosevelt v. E.I. Du Pont de Nemours & Co., 958 F.2d 416; Grimes v. Centerior Energy Corp., 909 F.2d 529, 531 (D.C.Cir.1990), cert. denied 498 U.S. 1073,·111 S.Ct. 799, 112 L.Ed.2d 860 (1991); Dole Food, 795 F.Supp. at 100; Austin, 788 F.Supp. at 194. See also, Zenith Radio Corp. v. United States, 437 U.S. 443, 450, 98 S.Ct. 2441, 24, 57 L.Ed.2d 337 (1978) (agency's contemporaneous construction of a statute or its own regulations is to be given great weight). As discussed above, that Release interpreted Rule 14a–8(c)(7) as permitting the exclusion of "proposals that are mundane in nature and do not involve any substantial policy or other considerations." 1976 Interpretive Release, 41 Fed.Reg. at 52,998 (emphasis added).

 Cracker Barrel fails to apply both parts of the Release's conjunctive standard. In Cracker Barrel, the Commission explicitly acknowledged that proposals in favor of or against the adoption of an EEO program

continue to raise "social policy" issues, and it did not suggest any diminished public or shareholder interest in these social issues. It nonetheless took the position that the SEC's inability to continue to draw lines warranted an across-the-board rule that any proposal relating to employment matters is excludable because it relates to day-to-day business affairs, regardless of whether the proposal also involves a substantial policy consideration. This interpretation contravenes the 1976 Interpretive Release's explicit recognition that all proposals could be seen as involving some aspect of day-to-day business operations. That recognition underlay the Release's statement that the SEC's determination of whether a company may exclude a proposal should not depend on whether the proposal could be characterized as involving some day-to-day business matter. Rather, the proposal may be excluded only after the proposal is also found to raise no substantial policy consideration. See 1976 Interpretive Release, 41 Fed.Reg. at 52,998 (proposal requesting company not to construct nuclear power plant may not be excluded even though the proposal also relates to the mundane matters of the fuel mix and types of electrical generating methods), referring to Potomac Electric Power Co., SEC No–Action Letter, 1976 SEC No–Act. LEXIS 622, *3 (Mar. 5, 1976). The SEC did not follow the 1976 Interpretive Release standard in Cracker Barrel or in the 1993 no-action letter issued to Wal–Mart, in that the SEC focused only on whether employment policies generally involve day-to-day business matters.[13]

### 2. Whether Application of the 1976 Interpretive Release Standard Independently Permits Wal–Mart to Exclude the Proposal

 Having concluded that deference is not owed to Cracker Barrel and the 1993

---

13. This is not to say that the SEC cannot change its views with regard to what issues involve substantial policy considerations. If the SEC finds that the issues of EEO and affirmative action programs no longer implicate significant policy considerations, the 1976 Interpretive Release permits exclusion of proposals relating to them. No such change of view was expressed in Cracker Barrel.

Nor does the court suggest that the SEC may not abandon the 1976 Interpretive Release altogether, so long as, in doing so, it complies with appropriate procedures, which procedures need not be addressed here. The court's holding today is limited solely to the proposition that a court should not defer to a position taken by the SEC in a no-action letter that is inconsistent with an SEC interpretation offered in the context of formal notice and comment rulemaking.

Wal–Mart no-action letter, the court considers whether Wal–Mart has carried its burden for excluding the Proposal under the standard articulated by the 1976 Interpretive Release and the corpus of SEC no-action letters that properly applied that standard, including *Dayton Hudson Corp.*, 1991 WL 178560, 1991 SEC No-Act. LEXIS 428 (Mar. 8, 1991) and *American Telephone & Telegraph Co.*, 1988 WL 235275 at 15 (Dec. 21, 1988).

Wal–Mart itself does not deny that equality and diversity in the workplace involve substantial policy considerations. (Def.Mem.Supp. at 27–28). Indeed, it would be difficult to sustain such a position in light of, among other things, the continual interest of Congress in employment discrimination since 1964, which was most recently underscored in the Civil Rights and Glass Ceiling Acts of 1991.

Rather, Wal–Mart argues that the Proposal would involve shareholders in dictating the *implementation* of a policy, albeit one of social import. Plaintiffs challenge that characterization of their Proposal. Regardless of whether the court characterizes the Proposal as seeking to *adopt* a policy or as seeking to *implement* a policy, the same inquiry guides the court: Does the proposal involve shareholders in dictating mundane matters that involve no substantial policy considerations? *See Medical Committee for Human Rights*, 432 F.2d at 679; *1976 Interpretive Release*, 41 Fed.Reg. at 52,998. *See also Roosevelt*, 958 F.2d at 429 (the adoption/implementation distinction is not dispositive under all circumstances because, depending on the situation, "implementation arrangements" may "implicate[ ] significant policy issues"); *Lovenheim*, 618 F.Supp. at 561 (refusing to exclude proposal asking directors to consider whether further distribution of *paté de foie gras* should be discontinued until a more humane production method is found).

The Proposal seeks to identify general corporate policy regarding equal employment opportunities and efforts, if any, to promote those policies among its suppliers, on whom Wal–Mart may have some influence. As plaintiffs argue, the Proposal does not involve shareholders in demanding, or monitoring compliance with, a specific timetable to accomplish plaintiffs' ultimate goal of improving Wal–Mart's EEO record. This aspect of the Proposal notably distinguishes it from the proposal considered in *Capital Cities/ABC* that the Commission found excludable. (Def. Ex. P [Letter from Secretary of SEC to General Counsel of Capital/Cities ABC, Apr. 4, 1991] at 1). Plaintiffs' Proposal does not require Wal–Mart to gather any employee-related information that it does not already gather for the purpose of complying with government regulations. The Proposal states that the report should be prepared "at reasonable cost, omitting confidential information," and may be comparable to the one or two page reports produced by other companies in Wal–Mart's industry. (Brouse Aff. at ¶¶ 19, 21a). The information about employees and policies toward suppliers requested in the Proposal is the same as the information the SEC considered appropriate in *Dayton Hudson*. *See Dayton Hudson Corp.*, SEC No-Action Letter, 1991 SEC No-Act. LEXIS 428 (Mar. 8, 1991). *See also General Electric Co.*, SEC No-Action Letter, 1991 SEC No-Act. LEXIS 143 (Jan. 25, 1991); *CBS, Inc.*, SEC No-Action Letter, 1991 SEC No-Act. LEXIS 437 (Mar. 7, 1991). The Proposal thus generally involves a significant policy consideration and does not otherwise fall within the exception for proposals relating to the conduct of Wal–Mart's "ordinary business operations."

However, the court finds that a literal reading of the Proposal suggests that the requested report must contain every "step" Wal–Mart management has taken to increase the number of female and minority managers and state all the "ways" Wal–Mart publicizes its EEO and affirmative action policies. Such "steps" could range from formal policies announced by the board of directors and officers, to the individual acts of each supervisor who implements these policies, and to other personnel and purchasing actions that occur hundreds of times each business day. A request for this latter information is excludable because it involves the mundane matters of Wal–Mart's day-to-day business affairs that involve no substantial policy consideration. The court, therefore, finds that

the Proposal may not be omitted from Wal–Mart's 1993 proxy material to the extent that plaintiffs agree [14] to the inclusion of the following proposal as an alternative to paragraphs 1–5 of the Proposal they submitted to Wal–Mart:

1. A chart identifying employees according to their sex and race in each of the nine major EEOC defined job categories for 1990, 1991, and 1992, listing either numbers or percentages in each category.

2. A summary description of any Affirmative Action policies and programs to improve performances, including job categories where women and minorities are underutilized.

3. A description of any policies and programs oriented specifically toward increasing the number of managers who are qualified females and/or belong to ethnic minorities.

4. A general description of how Wal–Mart publicizes our company's Affirmative Action policies and programs to merchandise suppliers and service providers.

5. A description of any policies and programs favoring the purchase of goods and services from minority- and/or female-owned business enterprises.

In modifying the Proposal, the court notes the practice of the SEC staff to revise a proposal submitted to it to correct minor defects. *Brief of Securities and Exchange Commission, Amicus Curiae* at 26 n. 21, *filed in Roosevelt v. E.I. Du Pont de Nemours & Co.*, 958 F.2d 416 (D.C.Cir.1992). These changes to the Proposal reflect a balance of the rights of shareholders to obtain information on an issue raising significant policy considerations and the right of management to run the day-to-day affairs of the corporation free from shareholder supervision.

### III. Conclusion

To summarize, Congress delegated to the SEC the task of ensuring that shareholders are informed on all the major questions of policy to be raised at an annual meeting. The SEC continues to implement Congress's goals by providing shareholders with the right to communicate with other shareholders and with management through the dissemination of proxy material on matters of broad social import such as plant closings, tobacco production, cigarette advertising and executive compensation. The SEC cannot, in effect, eliminate this avenue of shareholder communication with management and other shareholders on a topic of broad social import simply because it finds the line between proper and improper issues for communication hard to draw, and still act consistently with the principles enunciated in the 1976 Interpretive Release. If the SEC wishes to amend its rules or the 1976 Interpretive Release, it may do so. Or if the SEC no longer considers EEO and affirmative action policies to have broad social import—if a shift in public concerns has diminished interest in these social issues—the SEC simply can so state, consistent with the 1976 Interpretive Release. The SEC's difficulties in drawing these lines do not excuse it or the courts from making these decisions, which Congress has entrusted to the SEC and, ultimately, to the courts. The court draws a line here between includable and excludable proposals that is consistent with the line previously drawn by the SEC and the courts between matters involving substantial policy considerations and matters involving only "ordinary business operations." When assessed in light of this standard, the Proposal is not excludable.

For all the reasons discussed above, the court concludes that Wal–Mart has not sustained its burden of establishing that it may omit plaintiffs' Proposal, as modified, from Wal–Mart's 1993 proxy solicitation material. The court, therefore, denies Wal–Mart's motion and grants plaintiffs' motion for summary judgment. As stated in the court's Order dated April 19, 1993, Wal–Mart is enjoined from omitting plaintiffs' Proposal, as amended, from Wal–Mart's 1993 proxy material.

---

14. Plaintiffs consented to this change in language in an April 19, 1993 telephone conference with the court.

Wal–Mart's time to file a notice of appeal or to request a stay of this court's Order contained herein pending appeal shall run from the issuance of this Opinion and Order.

SO ORDERED.